417 A.2d 636

**Daniel BARBET,**

v.

**Kurosh OSTOVAR and Marjorie Ostovar, his wife; and
Meyers Bar Restaurant, Inc., t/d/b/a La Chaumiere
and Le Bistro, Appellants.**

Superior Court of Pennsylvania.

Argued June 13, 1978.

Filed Dec. 14, 1979.

Reargument Denied Feb. 26, 1980.

258

Carl A. Belin, Jr., Clearfield, for appellants.
William F. Donovan, State College, for appellee.

PER CURIAM:

The six judges who heard this appeal being equally divided, the order and decree of the court below is affirmed.

HESTER, J., files an Opinion in Support of Affirmance in which CERCONE, President Judge and VAN der VOORT, J., join.

SPAETH, J., files an Opinion in Support of Reversal in which PRICE and HOFFMAN, JJ., join.

JACOBS, Former President Judge, did not participate in the consideration or decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE

HESTER, Judge:

Presently before the court is an appeal from the Chancellor's Decree Nisi dated July 30, 1977.

In said Decree, the Chancellor granted the prayer of the complaint of the appellee and found: (a) that a partnership existed between appellee and appellant Kurosh Ostovar (hereinafter sometimes "Ostovar"); (b) that the stock, now in the name of appellant Marjorie Ostovar (hereinafter sometimes "Marjorie"), was held by her with beneficial ownership therein vested in appellee and Ostovar in equal shares; (c) that appellee should receive a full accounting from the appellants as to the business generated by said partnership; (d) that Joseph F. Taricani, C.P.A., be appointed to supervise said accounting; and (e) that the partnership be dissolved and that such payments and conveyances as are necessary and proper to carry out the findings of the Chancellor, be made and entered into by the parties.

We affirm.

■ The law of the Commonwealth is such that "we recognize that the findings of facts of the Chancellor who heard the testimony without a jury, approved by the court en banc, are entitled to the weight of a jury's verdict; that such findings are controlling and that the court's decree

should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Bogosian v. Foerderer*, 264 Pa.Super. 84, 399 A.2d 408 (1979); *Chatham Communication v. General Press*, 463 Pa. 292, at 297, 344 A.2d 837, at 840 (1975); *Lanning Will*, 414 Pa. 313, 316, 200 A.2d 392, 393 (1964); *Sterrett v. Sterrett*, 401 Pa. 583, 166 A.2d 1 (1960); *Brown v. Gresh*, 402 Pa. 35, 165 A.2d 629 (1960). However, where the conclusions reached by the Chancellor, either of law or ultimate fact, are no more than the Chancellor's reasoning from the underlying facts, such conclusions are reviewable. *Shapiro v. Shapiro*, 424 Pa. 120, 224 A.2d 164, 168 (1966).

Following a careful review of the record, we find that the Chancellor's findings of facts and conclusions of law are supported by a preponderance of the credible and believable evidence and, as such, said findings and conclusions are controlling upon this court and shall not be disturbed.

The credible evidence leads us to conclude that:

1. Appellee Daniel Barbet (hereinafter sometimes "Barbet") and Ostovar had become acquainted with each other in 1968 when Barbet married Ostovar's cousin.

2. Barbet had been primarily involved in the restaurant business all of his life, was trained as and became a chef. Ostovar was a graduate student at Penn State University where he subsequently received his Ph.D. in 1972, thereafter becoming an Assistant Professor at said institution.

3. All three of the individuals involved hereto, to-wit, Barbet, Ostovar and Ostovar's wife, Marjorie, were aliens, with Marjorie the closest to becoming a United States citizen, citizenship for her being expected by 1974.

4. In 1972, Ostovar contacted Barbet with the expressed intent of establishing a French-type restaurant in State College, Pennsylvania.

5. After Barbet made several journeys from Canada to State College at the request of Ostovar and following numerous discussions and plans for the establishment of a

French-type restaurant, the two men agreed upon establishing a partnership to conduct a restaurant business at 206 West College Avenue, in State College, Pennsylvania.

6. Barbet and Ostovar thereafter agreed to go into business as partners with the understanding that Ostovar was to provide the capital and Barbet was to provide his expertise and to actively manage and supervise the restaurant operations.

7. The parties further agreed that Ostovar was to receive from Barbet reimbursement of the one-half of Ostovar's financial advancements to the partnership business, together with interest, from and out of the partnership profits.

8. Thereafter, the parties executed a lease for the premises at 206 West College Avenue to be used for their restaurant business, both individuals signing the lease as "Kurosh Ostovar and Daniel Barbet, as partners, t/d/b/a La Chaumiere." The lessor at 206 West College Avenue assumed and dealt with Ostovar and Barbet as partners.

9. Barbet proceeded with renovation of the leased premises, purchase of equipment and related other matters, looking towards the opening of said restaurant; however, before completion thereof in June of 1973, the business establishment next door located at 210–214 West College Avenue and known as Meyers Bar Restaurant, Inc., became available for purchase.

10. Having arranged for the purchase of the stock of the Meyers Bar Restaurant, Inc. corporation, the Barbet-Ostovar partnership proceeded to sub-let (or assign) the previously leased premises at 206 West College Avenue to a book store operation. Again, Barbet and Ostovar executed said assignment and sub-lease documents as partners. Moreover, the sellers of the Meyers Corporation stock assumed and dealt with Barbet and Ostovar as partners.

11. The original plan as to assignment of moneys by Ostovar and provision of expertise by Barbet, was maintained throughout this transitional period. Specifically,

the kitchen equipment, tables and chairs previously ordered for 206 West College Avenue were transferred to 210–214 West College Avenue.

12. Under the mistaken belief held by all of the parties that aliens could not legally own stock in a business which held a liquor license, and since Ostovar's wife, Marjorie, was expected to be the first partner or partner's spouse to become an American citizen, it was decided, on advice of counsel, that instead of them purchasing the bar-restaurant or the corporation, the parties would enter into an option agreement whereby they would buy the corporate stock in Marjorie's name, but same would not be transferred to her until she became a citizen.

13. Accordingly, on August 15, 1973, the Option Agreement was executed. During the period of the option, Barbet and Ostovar took an active part in the operation of the restaurant as "consultants".

14. In 1975, the Meyers' corporate stock was thus transferred to Marjorie in accordance with the terms of the Option Agreement; but in all of the transactions, Barbet participated as a partner and was so acknowledged.

15. Marjorie did not engage in the day-to-day operations of the restaurant except to join with her husband Ostovar in the maintaining of the books and handling of the banking transactions.

16. Between August 15, 1973 (the date of the execution of the Option Agreement) and June 30, 1976 (the day locks were changed by Ostovar to exclude Barbet), Barbet worked practically full time at the restaurant. During that period, Barbet received a salary as Manager of the restaurant, and his wife received pay for services performed in the business and Ostovar and Marjorie similarly received pay for services. Furthermore, during this period, Ostovar and Barbet were reputed to be co-owners among some of the employees of the restaurant by virtue of the circumstances under which the restaurant was operated. Additionally, during this period, the restaurant

operation was a success; growing from 30 employees with annual sales of approximately $250,000 in 1973, to 60 employees with annual sales of almost $700,000 in 1976.

17. On April 15, 1976, the Collateral Security Agreement which had been originally executed in 1973 by Ostovar and Marjorie for the purchase of the Meyers' stock, was cancelled and a new Collateral Security Agreement and accompanying note was executed by Ostovar and Marjorie as well as by Barbet and his wife, obligating them as security on a judgment note to John Meyers (seller of the Meyers' stock) in the amount of $38,000.

18. The accountant for the corporation, Joseph F. Taricani, C.P.A., at all times, believed that Barbet and Ostovar were partners and the real parties in interest in the restaurant business. On May 5, 1976, Barbet and Ostovar met with Taricani and the corporation's attorney, at which meeting there was a discussion and agreement that Barbet owned one-half of the corporate stock. Attorney McCormick noted that agreement in his notes and Mr. Taricani recalled the same. The agreement, however, was not reduced to writing because Ostovar insisted that it was not necessary, stating, "Isn't my word good enough?"

19. Thereafter, the relationship between Barbet and Ostovar deteriorated rapidly. Several meetings were held to attempt to adjust their differences, all without success, until June 30, 1976, when the restaurant locks were changed by Ostovar to effectively, physically exclude Barbet from the premises. Barbet was also "dismissed" from his employment.

20. Thereafter, Ostovar proceeded to and has continued to proceed to operate the business on his own, refusing to acknowledge any rights of ownership in Barbet.

On July 7, 1976, Barbet filed the instant action in equity seeking specific performance of his partnership agreement with Ostovar and for an accounting in the ownership and operation of Chaumiere, the name of the French-style restaurant operated at 210–214 West College Avenue, State College, Pennsylvania. In addition, Barbet sought the

transfer to him of 50% of the issued and outstanding stock in the corporation known as Meyers Bar Restaurant, Inc., which corporate entity operated and continues to this day to operate La Chaumiere restaurant.

■ Following the trial of the instant action, we believe that the Chancellor correctly concluded as a matter of law that: (a) Barbet and Ostovar were, in fact, partners; (b) At no time was it contemplated that Marjorie would be the equitable owner of the stock of Meyers Bar Restaurant, Inc. but she was to hold same pursuant to the existing partnership arrangement between Barbet and Ostovar, one-half of the Meyers' stock for Barbet and one-half for Ostovar; (c) Notwithstanding the parties' mutual mistake with respect to the immigration laws of the United States, said misunderstanding cannot be the basis for denying Barbet his rights as a partner and co-owner in a business and that Barbet is entitled to the protection of equity with respect to his constitutional and property rights; (d) Pursuant to the Uniform Partnership Act, 1975, Dec. 19, P.L. 524, No. 155, § 1, 59 Pa.C.S.A. 354, Ostovar's conduct culminating in his locking Barbet out on June 30, 1976 and continuing to operate said restaurant as his own without acknowledging Barbet's right of ownership therein, must be considered such conduct as to cause a dissolutionment by decree of court of said partnership; (e) Barbet, therefore, is entitled to an accounting as to the partnership operations, said accounting to be supervised by C.P.A. Taricani; and (f) Marjorie must convey one-half of the issued and outstanding stock of Meyers Bar Restaurant, Inc., titled in her name, to Barbet, upon condition that an appropriate financial adjustment be made in accordance with the original understanding between the parties that capital contributions by both Ostovar and Barbet (the bulk of which were provided by Ostovar), be adjusted accordingly.

A partnership is defined in the *Uniform Partnership Act* as "an association of two or more persons to carry on as co-owners of business for profit." 59 Pa.C.S.A. 311(a) (Purdon's Supplement 1978–79).

■  It is entrenched in the law of the Commonwealth that the existence of a partnership depends upon the intentions of the parties as to being partners and that no formal or written agreement need be executed in order for a valid partnership to exist.  As the Pennsylvania Supreme Court has recently opined:

> There is no requirement that partnership agreements be in writing.  They may be made orally or may be found to exist by implication from all attending circumstances (i. e., the manner in which the alleged partners actually conducted their business, etc.).  *Murphy v. Burke*, 454 Pa. 391, 400, 311 A.2d 904, at 907 (1973).  (Citations omitted).

■  We find that the evidence supports the Chancellor's conclusion that Barbet satisfied his burden of proving that in 1972, he and Ostovar formed a partnership with the intention of owning and operating a restaurant in State College, Pennsylvania, and said partnership continued in existence until he (Barbet) was "locked out" in June, 1976. The record is replete with testimony documenting same, including the following:

1.  Barbet testified that sometime in 1972 or early 1973, he and Kurosh Ostovar entered into an oral agreement with respect to starting a restaurant business.  (Record at 266a, 327a).  Barbet recalled: "It was a very simple agreement.  Dr. Ostovar was supposed to invest for this business, and I was supposed to set up the business for him, to supervise it, and come down from time to time in this country to make sure the place was going right.  For disbursement of the profit, Dr. Ostovar was supposed to get his money out of the business, plus an interest on his money on the same amount that the bank would pay for the same—for interest, okay?  After that, the profit would be shared on an equal basis.  Now, that is exactly what it was."  (Record at 266a, 267a).

On cross-examination, Barbet stated:

Q.  Let's talk about the terms of this partnership agreement.

A.  Sure.

266

Q. As I understand, one, Dr. Ostovar was going to invest in the business; is that right?

A. That's right.

Q. And two, you were going to supervise this on an intermittent basis or from time to time?

A. I was going to set it up first, and then supervise it.

Q. And the third condition, if I understood, was that Dr. Ostovar was supposed to receive his investment back with interest?

A. That's right.

Q. After those conditions were met, did I understand, then you were supposed to receive the profits on a 50–50 basis; is that what you are saying?

A. Supposed to receive a profit, yes.

Q. I am asking you, was there a discussion or a term within this partnership relative to your immigration status?

A. Term of the partnership I have answered before, sir. The term was Dr. Ostovar put in the money and me run the business, okay? There was no other term or condition whatsoever.

(Record at 331a, 332a, 335a).

2. In February, 1973, the parties signed a lease for a building located at 206 West College Avenue, State College, Pennsylvania. The lessee was described as "Kurosh Ostovar and Daniel Barbet, as partners, t/d/b/a LA CHAUMIERE." (Exh. P–2, Record at 793a).

3. In June or July of 1973, they learned that the property next door, 210–214 West College Avenue, was available for sale and they decided that this would be a better location for their restaurant. They assigned the lease to 206 West College Avenue, specifying that "this assignment is made by and between KUROSH OSTOVAR and DANIEL BARBET, as partners, t/d/b/a LA CHAUMIERE . . . and EDWARD A. ADAMS and JEANNE G. ADAMS . . ." (Exh. P–3, Record at 810a).

4. Barbet and Ostovar then entered into negotiations with Adams and one, Mr. Bemis, for the purchase of Meyers Bar Restaurant, Inc. which was the tenant at 210–214 West College Avenue. Adams testified that Ostovar said that Barbet was his partner "[m]ore than once." (Record at 300a). Bemis testified that he treated the parties interchangeably. (Record at 308a).

5. The negotiations resulted in the execution of several documents: an "Option to Purchase Business" of Meyers Bar Restaurant (Exh. D–17, Record 868a); a "Collateral Security Judgment Note" for $53,000 (Exh. D–22, Record 892a); and a "Letter of Intent" (Exh. D–23, 893a). Only Ostovar and his wife Marjorie signed these documents.

5(a). In late 1974, Marjorie Ostovar became a citizen of the United States, purchased the stock of Meyers Bar Restaurant, Inc., and became its President (Exh. D–24, Record at 895a).

6. From the latter half of 1973 until May, 1976, Barbet devoted himself to the operation of the restaurant. He found that he needed to work "full time" there, and in the fall of 1973, he moved his family from Canada to State College (Record at 277a, 346a). He described himself as "running the restaurant" (Record at 282a), and said that he received $1,000 a month from the business to support his family (Record at 287a).

7. During 1974 and 1975, Barbet made three capital contributions to the restaurant business (Record at 295a, 820a, 821a, 822a).

8. During 1975, while Ostovar was in Iran, Barbet supervised an addition to the restaurant, notwithstanding Ostovar's objections that the project should wait until the following year (Record at 289a, 818a).

9. In early 1976, he signed a note for the purpose of obtaining funds for the payment of premiums on various types of business insurance (Record at 286a, 816a).

10. Finally, on April 15, 1976, Barbet, his wife, Ostovar and Marjorie executed a collateral security agreement with the lessors of 210–214 West College Avenue (Exh. P–10, Record at 823a).

11. Certain key employees of the restaurant and others who dealt with it, differed in their assessment of the business relationship between Barbet and Ostovar. For instance, Mr. Pallas, the Manager of Meyers Bar Restaurant, testified that Barbet did not hold himself out as a partner until June, 1976 (R. at 601a). Mr. Dodson, a bartender who started working there in August of 1975, believed that Ostovar was the owner and referred to Barbet as "Manager of the restaurant (R. at 549a, 55a). Contrariwise, Mr. Gottschall, a full-time cook beginning in September, 1975, stated that "[f]rom discussions I had with the other workers, it was my knowledge that he [Barbet] was half-owner" (Record at 451a). Two outside contractors recalled that Ostovar had referred to Barbet as his partner on various occasions (R. 464a, 472a). Finally, a police officer testified that the same Mr. Pallas who had testified that Barbet did not hold himself out as a partner until June, 1976 (above) had told him that Barbet and Ostovar were co-owners of the restaurant when this information was required for a burglary report prepared in April, 1976 (R. at 448a).

12. In May, 1976, the business relationship between Barbet and Ostovar soured. Barbet testified that he believed their original oral agreement was still in effect; ".   .   . the agreement as to the stock [of Meyers Bar Restaurant, Inc.] was the "same agreement we had in the beginning. I was partner with Dr. Ostovar,   .   .   . The beneficial owner of the stock was Dr. Ostovar and myself." (Record at 275a, 276a).

13. On May 5, 1976, in an effort to reduce the agreement to writing, Barbet met with Ostovar, Mr. Taricani, the C.P.A., and Mr. McCormick, the attorney for Meyers Bar Restaurant, Inc. At the meeting, Barbet pressed for a written agreement that would state "that 50 percent of the business is mine" (Record at 291a), but Ostovar demurred, asking, "Isn't my word good enough?" to which all three men replied, "Why of course it is." (Record at 417a). Barbet testified that there was no dispute at the meeting at to his 50 percent ownership (Record at 291a).

14. Mr. Taricani recalled the May 5, 1976 meeting: "[T]here were several matters discussed at this meeting, but in that particular avenue, why, the consensus was that he would be given the 50 percent of the outstanding stock of Meyers Bar Restaurant, Inc., upon his becoming a United States citizen. And at that time, the other condition was put in, which was agreeable by everybody, that Dr. Ostovar would get back his investment that he had made in the Meyers Bar Restaurant. And when those two events occurred, that Mr. Ostovar—Mr. Barbet would be given 50 percent of the outstanding stock." (Record at 415a). Taricani further stated: "There was no question as to whether he had rights to one-half of the stock upon the occurrence of those events." (Record at 416a).

15. On May 12, 1976, the parties met again to attempt to resolve their differences. Mr. Taricani was present and testified that Barbet said he wanted to sell his interest in the restaurant, that Ostovar at first denied Barbet had an interest, but finally, "after about another half-hour, it was agreed he did have a half-interest." (Record at 423a).

16. Again the parties met on May 25, 1976; both Taricani and McCormick agreed that the meeting was to resolve the differences. McCormick testified that ". . . Whether each owned half or not, was not the issue." (Record 513a). Taricani testified that Ostovar "offered to by Mr. Barbet's half interest at an appraisal price, which it was agreed we would have three independent appraisals made of the business. And as I recall, the conditions at that time were for $5,000 down and the balance to be determined later on." (Record at 425a).

17. Barbet and Taricani both testified that after the meeting of May 25, the parties had a brief encounter in June, when various appraisals of the business were presented. (Record at 426a). Barbet was unsatisfied, and shortly afterwards, Ostovar locked him out of the restaurant.

Appellants contend that the terms of the 1972 oral agreement between Barbet and Ostovar demonstrate at

most, an agreement between them to become partners in the future, but only upon the happening of certain conditions precedent, those conditions precedent being the repayment to Ostovar of his capital investments, with interest, and Barbet's resolution of his immigration problems.

We do not agree.

Our examination of the record leads us to conclude that Barbet and Ostovar had unequivocally entered into an oral partnership. This is very clear. They further agreed that profits were not to be distributed until Ostovar had been repaid his original investment, plus interest, and that Barbet would receive a stock certificate representing a fifty percent interest in the corporation once he became a United States citizen. The foregoing were merely conditions governing the operation of the partnership business. They were not conditions precedent which had to be fulfilled before the partnership came into existence.

■ The repayment of capital investments before distribution of profits is an essential element of every partnership agreement implied as a term thereof by law. See *Uniform Partnership Act*, supra, Section 311.

■ We further conclude that the Chancellor appropriately found that the stock of the Meyers Bar Restaurant, Inc. held in the name of Marjorie Ostovar, was actually held by her on behalf of the original partners in the restaurant business, Barbet and Ostovar; and further, the original partnership arrangement between Barbet and Ostovar determined their right to one-half (½) of the stock in the corporation. The corporate entity was adopted as a convenience only and legal title in the stock of said corporation was similarly obtained in Marjorie's name as a convenience only. Equity demands, therefore, that fifty percent (50%) of the stock of said corporation be issued in the name of Ostovar and fifty percent (50%) in the name of Barbet.

Finally, an accounting of all of the activities of the restaurant business, whether they be in partnership or corporate form, is not only provided for but appears to be required in this case.

We therefore conclude that the Final Decree dated October 17, 1977, is appropriate and equitable under all of the circumstances and is supported by credible evidence; hence, same will not be altered by this court.

Decree affirmed.

CERCONE, President Judge, and VAN der VOORT, J., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

SPAETH, Judge:

I dissent because I am not persuaded by the Opinion in Support of Affirmance that a partnership existed in this case. The Opinion in Support of Affirmance states:

> Our examination of the record leads us to conclude that Barbet and Ostovar had unequivocally entered into an oral partnership. This is very clear. They further agreed that profits were not to be distributed until Ostovar had been repaid his original investment, plus interest, and that Barbet would receive a stock certificate representing a fifty percent interest in the corporation once he became a United States citizen. The foregoing were merely conditions governing the operation of the partnership business. They were not conditions precedent which had to be fulfilled before the partnership came into existence.
>
> At 643–644.

My examination of the record leads me to conclude that Barbet's proof of the partnership was far from clear, and did not meet the burden of proof that must be met before a court may declare the parties to be partners.

The burden of proving a partnership is on the party seeking relief. *Kirshon v. Friedman*, 349 Pa. 171, 36 A.2d 647 (1944); *Beaver v. Slane*, 271 Pa. 317, 114 A. 509 (1921). This burden "cannot be met by conjectures. The phrase 'burden of proof' means exactly what it says. . . . In a civil case the evidence of facts and circumstances on which plaintiff relies and the inferences logically deducible therefrom, must so preponderate in favor of the basic proposition

he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition." *Kirshon v. Friedman, supra,* 349 Pa. at 178, 36 A.2d at 650. Furthermore, here, because Barbet was seeking "specific performance of an oral agreement of partnership," Record at 73a, he had an additionally heavy burden. It is well established that a "plaintiff . . . must clearly make out the right on which [he] relies, in order to be entitled to specific performance." *Markovitz v. Markovitz,* 318 Pa. 58, 61, 177 A. 786, 787 (1935). "A court of equity will not enforce a contract unless it is complete and certain in all its essential elements. The parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms of the contract, the case is not one for specific performance." *Beaver v. Slane, supra,* 271 Pa. at 322, 114 A. at 510.

Barbet's own testimony did not satisfy these requirements. The fairest characterization of it, indeed, is that it supported Ostovar's version of the agreement more clearly than the version that Barbet urges upon us. Barbet testified that sometime in 1972 or early 1973 he and Ostovar entered into an oral agreement with respect to starting a restaurant business. Record at 266a, 327a. He stated:

It was a very simple agreement. Dr. Ostovar was supposed to invest for this business, and I was supposed to set up the business for him, to supervise it, and come down from time to time in this country to make sure the place was going right. For disbursement of the profit, Dr. Ostovar was supposed to get his money out of the business, plus an interest on his money on the same amount that the bank would pay for the same—for interest, okay? After that, the profit would be shared on an equal basis. Now, that is exactly what it was.

Record at 266a, 267a.

Later, on cross-examination, Barbet stated:

Q. Let's talk about the terms of this partnership agreement.

A. Sure.

Q. As I understand, one, Dr. Ostovar was going to invest in the business; is that right?

A. That's right.

Q. And two, you were going to supervise this on an intermittent basis or from time to time?

A. I was going to set it up first, and then supervise it.

Q. And the third condition, if I understood, was that Dr. Ostovar was supposed to receive his investment back with interest?

A. That's right.

Q. After those conditions were met, did I understand, then you were supposed to receive the profits on a 50–50 basis; is that what you are saying?

A. Supposed to receive a profit, yes.

Q. I am asking you, was there a discussion or a term within this partnership relative to your immigration status?

A. Term of the partnership I have answered before, sir. The term was Dr. Ostovar put in the money and me run the business, okay? There was no other term or condition whatsoever.

Record at 331a, 332a, 335a.

The fact that the restaurant, as it turned out, was operated under the auspices of Meyers' Bar Restaurant, Inc., does not seem to have altered this initial understanding, except that the parties believed that Barbet would have to become a citizen of the United States before he could own the corporation's stock. At least, so Barbet's witness Taricani testified. In describing the May 5 meeting between the parties, he said:

[H]e [Barbet] would be given 50 per cent of the outstanding stock of Meyers' Bar Restaurant, Inc., upon his becoming a United States citizen. And at that time, the other condition was put in, which was agreeable by everybody, that Dr. Ostovar would get back his investment that he had made in the Meyers' Bar Restaurant. And when

those two events occurred, that Mr. Ostovar—Mr. Barbet would be given 50 per cent of the outstanding stock. Record at 415a.

Finally, Taricani's testimony was corroborated by Ostovar's letter of June 3 to Barbet's in-laws, which *Barbet* offered in evidence, that the parties would only become "partners" after "their immigration matter is straightened out and I get my original investment in the restaurant back." Record at 690a, 832.

Thus, Barbet's own proof strongly suggests, if it does not prove, that the agreement of the parties throughout was that Barbet would share in the profits *only after* Ostovar had received his investment back with interest—a condition Barbet admitted had not been fulfilled when the parties separated. Record at 372a. The Supreme Court has said that "an agreement to become partners at a future time will not make the parties partners." *Kirshon v. Friedman, supra,* 349 Pa. at 179, 36 A.2d at 651. *See also Coens v. Marousis,* 275 Pa. 478, 119 A. 549 (1923); *Beaver v. Slane, supra; Irwin v. Bidwell,* 72 Pa. 244 (1872). In *Coens,* two parties agreed that one would contribute his services to a business and the other his capital, and that once the second received his investment back, the first would be entitled to half the profits. The Supreme Court concluded that this agreement did not make the parties partners. "Persons who have entered into a contract to become partners at some future time, or upon the happening of some future contingency, do not become partners until the agreed time has arrived, or the contingency has happened . . . . A mere agreement to form one does not of itself create a partnership, nor does the advancement by one party of his agreed share of the capital." 275 Pa. at 481, 119 A. 550. *See also Rowley v. Rowley,* 294 Pa. 535, 144 A. 537 (1928); *Comstock v. Thompson,* 286 Pa. 457, 133 A. 638 (1926).

The Opinion in Support of Affirmance points out that Barbet and Ostovar signed a lease to 206 West College Avenue "as partners, t/d/b/a LA CHAUMIERE," Exh. P–2, Record at 793a; that they assigned the lease as partners,

t/d/b/a LA CHAUMIERE, Exh. P–3, Record 810a; that during negotiations for the option to purchase the business at 210 West College Avenue, Ostovar referred to Barbet as his partner "[m]ore than once," Record at 300a; that Barbet supervised an addition to the restaurant while Ostovar was in Iran in 1975, Record at 289a, notwithstanding Ostovar's objections that the project should be delayed, Record at 818a; that Barbet made three monetary contributions to the business during 1974 and 1975, Record at 295a, 820a, 821a, 822a; that some employees of the restaurant believed that Barbet and Ostovar were co-owners, Record at 448a, 451a; that two outside contractors stated that Ostovar referred to Barbet as a partner on various occasions, Record at 464a, 472a; that Barbet signed a note on behalf of the restaurant in March 1976, Record at 286a, 816a; that Barbet and his wife were co-obligors with the Ostovers on a collateral security agreement signed April 15, 1976, Record at 297a, 823a; and, finally, that Ostovar "offered to buy Mr. Barbet's half interest at an appraisal price." Record at 425a.

This evidence does not undo, or negate, the effect on Barbet's case of his own testimony, which I have quoted above, and of Taricani's testimony and the letter of June 3, also quoted above. A party who "must clearly make out the right on which [he] relies," *Markovitz v. Markovitz, supra*, by "complete and certain" evidence, *Beaver v. Slane, supra*, does not meet his burden of proof by offering some evidence tending to show that the parties were partners, while at the same time offering other evidence that the agreement was that only upon the satisfaction of certain conditions would they become partners.

Some of the evidence relied upon by the Opinion in Support of Affirmance represents admissions by Ostovar that Barbet was his "partner." These admissions, however, must be regarded with some caution. In *Zuback v. Bakmaz*, 346 Pa. 279, 29 A.2d 473 (1943), the Supreme Court was confronted by an appellant who claimed that a lower court's refusal to find a partnership should be reversed, in part because the appellee had referred to him as a "partner" on

276

several occasions. The Court was unimpressed: "As the lower court points out, the term 'partners' is used to designate various relationships such as companions, fellow workers, or close friends." 346 Pa. at 282, 29 A.2d at 474. Also, the Court noted that the appellee, like Ostovar, was a foreigner, and said: "The use of the word 'partner' by a foreigner with little appreciation of the precise meaning of words is of very doubtful import and aside from the question of credibility we believe the court was warranted in giving little weight to [the appellant's] witnesses in this respect." 346 Pa. 282, 29 A.2d at 474. If this were a suit by a third party to enforce a partnership between Barbet and Ostovar, these admissions, made by both men, might be dispositive. However, this is not such a suit; the issue is not how the parties appeared to others to have agreed, but what they had in fact agreed. *See Kingsley Clothing Mfg. Co. v. Jacobs*, 344 Pa. 551, 26 A.2d 315 (1942).

Nor does the other evidence referred to in the Opinion in Support of Affirmance support a finding that a partnership existed. Barbet's supervision of the restaurant and decision to build an addition to it over the objections of Ostovar, Record at 289a, are consistent with his admission to one of the employees in August 1975 that he was the restaurant's "manager." Record at 550a. His monetary contributions to the restaurant, Record at 295a, 820a, 821a, 822a, and his willingness to be obligated financially on behalf of the restaurant, Record at 286a, 816a, provide a stronger suggestion that he was a partner but are also consistent with the notion that he was planning to become one in the future. Finally, the evidence that there was an offer by Ostovar to "buy Mr. Barbet's half interest at an appraisal price," Record at 425a, refers to an offer made at a meeting on May 25, and must be appraised in the context of the testimony of both Taricani, who testified for Barbet, and McCormick, who testified for the Ostovars, that that meeting was not intended to define the interests of the parties, but rather to "resolve the differences." Record at 719a. Indeed, Taricani

stated that the conditions on the transfer of stock, which had been set out at the May 5 meeting, which is the meeting with respect to which I have quoted Taricani, remained in effect at the May 25 meeting. Record at 427a.

Given that the evidence shows that the parties only intended to become partners after specified conditions had been met, I am baffled by the further observation found in the Opinion in Support of Affirmance that "[t]he repayment of capital investments before distribution of profits is an essential element of every partnership agreement implied as a term thereof by law. *See Uniform Partnership Act, supra,* Section 311." Section 311 defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit," and is thus inapposite. Perhaps the Opinion in Support of Affirmance meant to cite Section 331 of the Act, which provides:

> The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> (1) Each partner shall be repaid his contributions whether by way of capital or advances to the partnership property, and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership, according to his share in the profits.

If, indeed, this is the section the Opinion in Support of Affirmance meant to cite, I am not persuaded. Section 331 defines the relationship between the parties once they become partners; it does not deal with the threshold question of whether they are partners.

The order of the lower court should be reversed and the case remanded so that the court may decide whether, even though not a partner, Barbet has a right to an accounting.

PRICE and HOFFMAN, JJ., join in this opinion.