424 A.2d 921

John FUDULA,

v.

KEYSTONE WIRE & IRON WORKS, INC. and The First
Pennsylvania Banking and Trust Company, Appellants.

Superior Court of Pennsylvania.

Argued Sept. 9, 1980.

Filed Jan. 16, 1981.

Joseph Lurie, Philadelphia, for appellants.

Mabel D. Sellers, Ambler, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This is an appeal from a final decree in equity directing the retroactive reinstatement of appellee in a profit sharing and retirement plan.

Appellee, John Fudula, began working for appellant Keystone Wire & Iron Works, Inc., in 1945 as a foreman. As a foreman, appellee was in a supervisory position, and by 1955 he began to be paid on a salaried basis. However, at the request of Robert Robinson, who was Keystone's president and chief stockholder, and appellee's close friend, appellee continued to be a member of the Ironworkers Union. In 1959 Keystone established an IRS-qualified profit-sharing and retirement plan for its salaried employees, and named appellant The First Pennsylvania Banking and Trust Company as trustee. As a salaried employee, appellee was included in the plan, and he received yearly statements from First Pennsylvania concerning his interest in the plan's fund.

When members of the Ironworkers Union went on strike at Keystone in 1962, appellee offered to quit the union. However, Robinson asked him to continue his membership in the union and to join the picket line, and Keystone continued to pay appellee his full salary while he was out on strike. The strike resulted in a collective bargaining agreement that obligated Keystone to contribute to a union pension plan on behalf of each qualified union member in its employ. Since appellee was both a union member and a salaried employee, he was eligible for membership in both the union pension plan and Keystone's profit-sharing plan. However, Keystone's accountant informed Robinson as Keystone's president that Keystone could not contribute to both plans on behalf of appellee and continue to enjoy favorable tax treatment of these contributions. This advice was erroneous: IRS regulations allow an employer to deduct contributions made on behalf of an employee to more than one pension plan as long as the total amount deducted does not exceed 25 per cent of the compensation otherwise paid to the employee,[1] and Keystone's contributions to both plans would not have exceeded 17 per cent of the compensation otherwise paid appellee. Nevertheless, acting on the accountant's advice, Robinson met with appellee and Charles Schleeter (the one other employee who was eligible for both plans), informed them of the accountant's advice, and told them that they would have to choose one of the two plans. Appellee denied that this meeting had ever taken place, but the lower court found that it had, and that as a result of it, appellee chose to continue his membership in the union pension plan and to withdraw from Keystone's profit-sharing plan.

In December 1972 appellee retired from Keystone. After receiving a much smaller payment from the profit-sharing plan than he had anticipated, he discovered that since 1962, Keystone had made no payments to this account.

On April 19, 1974, appellee instituted this action in equity, seeking his reinstatement in Keystone's plan an accounting

1. *See* Section 404(a), Internal Revenue Code of 1954, 26 U.S.C.A. § 404(a).

of all contributions made into the plan on behalf of him and all other participants, and a recalculation of his vested interest in the plan. Appellants' preliminary objection that appellee had an adequate remedy at law was dismissed by the lower court without an opinion. On September 19, 1977, after a hearing on March 1 and 2, 1977, the chancellor entered an adjudication and decree nisi dismissing the complaint. This decision was based on the chancellor's finding, mentioned above, that after his meeting in 1962 with Robinson, appellee had chosen to withdraw from Keystone's profit-sharing plan, and on the conclusion that appellee was therefore not entitled to benefits after that date. On appellee's exceptions to the chancellor's adjudication, the lower court *en banc* concluded that the chancellor had erred. It was of the opinion that appellee should be permitted to rescind his withdrawal from Keystone's plan as based on Robinson's and appellee's mutual mistake in accepting the accountant's advice as accurate. Accordingly, by final decree of January 29, 1980, the court *en banc* ordered appellants to reinstate appellee in the plan, retroactive to 1962, to render an accounting, and to recalculate appellee's vested interest in the plan.

On appeal, appellants argue: 1) that appellee has an adequate remedy at law; 2) that the action is barred either by the statute of limitations or by laches; and 3) that in permitting appellee to rescind his withdrawal from the plan, the court *en banc* ignored important evidence.

1

 In arguing that appellee has an adequate remedy at law, appellants, say that appellee's action is really in assumpsit, for money damages, and that in an action in assumpsit an accounting may be demanded. Appellants are correct that in an action in assumpsit an accounting may be demanded. *See* Pa.R.Civ.P. 1021; *Setlock v. Sutila*, 444 Pa. 552, 282 A.2d 380 (1971); *Stuyvesant Insurance Company v. Keystone Insurance Agency, Inc.*, 420 Pa. 578, 218 A.2d 294 (1966). However, equity has jurisdiction of an action for an accounting "when the accounts are mutual or complicated or

when discovery is needed and is material to the relief." *Setlock v. Sutila, supra* 444 Pa. at 554, 282 A.2d at 381. *See also Stuyvesant Insurance Company v. Keystone Insurance Agency, Inc., supra; Williams v. Finlaw, Mueller & Co., Inc.,* 292 Pa. 244, 141 A. 47 (1928); *Crennell v. Fulton,* 241 Pa. 572, 88 A. 783 (1913). The question therefore, is whether in the present case it may be said "that a jury would not be qualified to state such an account," or even that "it is doubtful whether adequate relief could be had at law." *Stuyvesant Insurance Company v. Keystone Insurance Agency, Inc., supra* 420 Pa. at 581, 218 A.2d at 296, *quoting Williams v. Finlaw, Mueller & Co., Inc., supra.*

According to Keystone's plan,[2] Keystone was obligated to contribute ten per cent of its net income each year to the plan; it could also contribute additional amounts as specially authorized by its Board of Directors (Plan, IV—A). The total amount contributed each year was to be "allocated proportionately among the Members [of the plan] on the basis of the ratio that the total compensation of each member [bore] to the total compensation of all the members." (Plan, V—A). Any amounts forfeited or otherwise undistributable were also to be allocated proportionately each year to members' accounts (Plan, VIII—F). In addition, members of the plan could make voluntary contributions to their accounts of up to ten per cent of their total annual compensation (Plan, IV—D). The total fund of all the members' accounts was to be invested as a unit (Plan, VI—B), the fund was to be valued at least annually, and the members' accounts were to be adjusted to preserve their proportionate beneficial interests in the fund (Plan, VI—C).

■ Since Keystone made no contributions to appellee's account from 1963 until his retirement in 1972, appellee's interest in the plan will have to be recalculated for those ten years. We cannot say with certainty that it would be impossible for a jury, with extensive expert testimony, to state such an account; but given the complexity of the plan

2. A copy of Keystone's plan was attached to appellee's complaint as Exhibit "A".

and the number of years involved, we cannot say either that this accounting is so simple that equitable jurisdiction was lacking.

■ Furthermore, we note an additional ground for equitable jurisdiction. As mentioned, the lower court permitted appellee to rescind his withdrawal from the plan as based on mutual mistake. It is settled that equity has jurisdiction to correct mistakes. *Smith v. Capital Bank and Trust*, 325 Pa. 369, 191 A.2d 124 (1937).

### 2

■ The statute of limitations[3] is an affirmative defense, which must be specifically pleaded as "New Matter." Pa.R.Civ.P. 1030, 1051; *Ziemba v. Hagerty*, 436 Pa. 179, 259 A.2d 876 (1969); *Fike v. Ball*, 234 Pa.Super. 305, 338 A.2d 619 (1975); *Louis v. Clark*, 227 Pa.Super. 547, 323 A.2d 298 (1974). The defense is waived if it is not pleaded. Pa.R. Civ.P. 1032, 1051. Although appellants pleaded the defense of laches in their answer to appellee's complaint, they did not plead the defense of the statute of limitations, nor did they at any time petition the lower court for leave to amend their answer to plead that defense. *See* Pa.R.Civ.P. 1033. We therefore conclude that appellants have waived the defense of the statute of limitations. Furthermore, we will not consider defenses not raised in the court below. *Teodori v. Penn Hills School District Authority*, 413 Pa. 127, 196 A.2d 306 (1964); *Williams v. Philadelphia Transportation Company*, 219 Pa.Super. 134, 280 A.2d 612 (1971).

The Supreme Court has summarized the requirements of the defense of laches as follows:

This defense bars relief when "the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." *Wilson v. King of Prussia Enterprises, Inc.*, 422 Pa. 128, 133, 221 A.2d 123, 126 (1966); accord, *Thompson v. Curwensville Water Co.*, 400

---

**3.** The statute applicable to the present case is the Act of March 27, 1713, 1 Sm.L. 76 § 1, 12 P.S. § 31, repealed by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a)[9], effective June 28, 1978.

Pa. 380, 162 A.2d 198 (1960); *Commonwealth ex rel. Storb v. Schroll*, 398 Pa. 354, 157 A.2d 179 (1960). A party asserting laches must demonstrate prejudice resulting from the lapse of time. *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975); *Beaver v. Penntech Paper Co.*, 452 Pa. 542, 307 A.2d 281 (1973); *Young v. Hall*, 421 Pa. 214, 218 A.2d 781 (1966); *Miller v. Hawkins*, 416 Pa. 180, 205 A.2d 429 (1964); *Brodt v. Brown*, 404 Pa. 391, 172 A.2d 152 (1961). The question of laches is factual and is determined by examining the circumstances of each case. *Siegel v. Engstrom*, 427 Pa. 381, 235 A.2d 365 (1967); *Wilson v. King of Prussia Enterprises, Inc.*, supra; *Mulholland v. Pittsburgh National Bank*, 418 Pa. 96, 209 A.2d 857 (1965).

*Leedom v. Thomas*, 473 Pa. 193, 200–201, 373 A.2d 1329, 1332 (1977).

In rejecting appellants' defense of laches, the lower court said:

In balancing the equities, we conclude that plaintiff's claim is not barred by laches. Although due diligence is required of a plaintiff in ascertaining his rights, we do not believe plaintiff should be held to learning the intricacies of IRS pension law and discovering the erroneous tax advice in 1962. Plaintiff was justified in relying on the statements of Robinson and the accountant that he had to choose one plan or the other and should not now be penalized for his trust in the honesty and good faith of Robinson, his friend and employer. After plaintiff received payment from the fund and questioned the amount, he acted with due diligence in protecting his rights. In addition, we do not see any prejudice to Keystone in allowing plaintiff's claim. Keystone was obligated under the terms of the collective bargaining agreement and the terms of its Profit Sharing and Retirement Plan to contribute to both on behalf of Fudala. Simply by putting Fudala on hourly wages or designating him supervisory, Keystone could have eliminated one of these obligations. We see no reason why plaintiff should be deprived of retirement benefits to which he is clearly entitled because

of a mistake (innocent or deliberate) that can easily be remedied. Clearly the prejudice to plaintiff were we to deny his claim far outweighs any prejudice to Keystone. Slip op. at 6–7.

Appellants' argument that appellee's claim is barred by laches depends upon appellants' view of the evidence. They point out that the chancellor found, despite appellee's testimony to the contrary, that in 1962 after a meeting with Robinson and a fellow-worker, appellee chose to withdraw from the plan. In addition, appellee testified that after 1962 he received no statements concerning his interest in the plan. N.T. at 32, 57–59. Furthermore, he testified that in 1964 he himself had some doubts about his participation and therefore called First Pennsylvania to ask whether any Keystone employees had been dropped from the plan, but when a bank employee informed him that only employees paid on an hourly basis had been dropped, he did not pursue his investigation further—he did not even ask whether he was one of those dropped. N.T. at 40, 50–52. On the basis of this evidence appellants argue that appellee was remiss in pursuing his rights under the profit-sharing plan: that he knew or should have known that he had made a choice; that he himself had doubts about whether he was still a member of the plan; and that he should have acted sooner.

In emphasizing this evidence, however, appellants have ignored the findings of the lower court. It is true that appellee strenuously denied that he had ever chosen to withdraw from the plan, and that he testified as to why he thought he was still a member: he said that he was informed by a First Pennsylvania employee in 1964 that only workers who were paid on an hourly basis had been dropped from the plan and therefore assumed that as a salaried employee, he was still covered; he also said that in 1965 Robinson urged him to return to Keystone's employ after an absence of several weeks by pointing out that otherwise he would lose his benefits in the plan. N.T. at 35–38, 59–62. However, the lower court did not accept appellee's testimony, but instead found that he had chosen to withdraw from

the plan. In reviewing the lower court's decision, we must take this finding as our point of departure.

▮▮▮▮ Having found that appellee had chosen to withdraw from the plan, the lower court went on to find that this choice was made on the basis of a mutual mistake—the mistaken advice of Keystone's accountant—and, therefore, was subject to rescission. The first question to be answered in deciding whether appellee's claim is barred by laches is therefore not as appellants would state it, "When did appellee know, or when should he have known, that he had been dropped from the plan?" but rather, "Was appellee remiss in discovering that his choice to withdraw from the plan was based on a mistake, and in acting to rescind that mistaken choice?" On this question, we see no reason to disturb the lower court's conclusion that appellee should not "be held to learning the intricacies of IRS pension law and discovering the erroneous tax advice in 1962," and that he "was justified in relying on the statements of Robinson and the accountant that he had to choose one plan or the other and should not be now penalized for his trust in the honesty and good faith of Robinson, his friend and employer." Slip op. at 6.

The second question to be answered in deciding whether appellee's claim is barred by laches is whether appellants have been prejudiced. It is true that had appellee investigated his rights under the plan further and discovered the mistake sooner, Keystone might have chosen to eliminate his eligibility for both plans either by paying him on an hourly basis (so that he would not be eligible for the profit-sharing plan) or by designating him a supervisory employee (so that he would not be eligible for the union plan). Because appellee failed so to act, the result is that he remains eligible for both plans when he might otherwise not have. In that sense, appellants may be able to claim "prejudice." But this kind of prejudice is far too speculative. The lower court found that appellee was "a close friend of Robinson and occupied a position of unusual responsibility and confidence," and that "[d]uring a strike in 1962 [appellee] offered to drop out of the union, but Robinson told him to go out on picket and paid him full salary while so engaged." Findings

of Fact Nos. 6 and 7. Given these findings, we are unable to say that Robinson would not have chosen to keep his old friend and trusted employee in both plans if he had known that Keystone would still retain its tax advantages.

Appellants have not demonstrated any other "prejudice resulting from the lapse of time." *Leedom v. Thomas, supra,* 473 Pa. at 200, 373 A.2d at 1332. This is not a situation in which appellants' case was hindered by the loss of records or the death or loss of memory of an important witness. Indeed, the lower court resolved the major factual issue—whether appellee had chosen to withdraw from Keystone's plan—in appellants' favor.

*Elias v. Elias,* 428 Pa. 159, 237 A.2d 215 (1968), on which appellants rely in their brief, is distinguishable. *Elias* involved a dispute over rights in a family partnership. The plaintiff, Thomas, left a family business in 1957 after a dispute with the managing partner, his older brother William, who believed that Thomas was wrongfully appropriating partnership funds to his own use. Thomas made no claims against the partnership until 1965, after William's death. In upholding the lower court's dismissal of Thomas's complaint, the Supreme Court said:

> If the contract in fact did not wholly kill the plaintiff's right to an accounting, Laches did indeed deliver the mortal blow. Lacking fraud or concealment the general rule is that laches follows the Statute of Limitations. We said in *First National Bank v. Lytle Coal Co.,* 332 Pa. 394 [3 A.2d 350]: " 'Equity will not lend its aid to one who has slept upon his rights until the original transaction is obscured by lapse of years and death of parties: *Kinter v. Commonwealth Trust Co.,* 274 Pa. 436, [118 A. 392] and where a party having the right to set aside a transaction stands by and sees another dealing with the property in a manner inconsistent with his alleged claim and makes no objection, a delay of six years will bar a suit in equity.' "

The delay in this case was well beyond the six years statute of limitations. Laches particularly applies also because Thomas took no action until after William died. The court below appropriately observed: "Since William

was admittedly the party who had the most intimate knowledge of the operation of the business, the defendants are obviously seriously prejudiced by plaintiff's failure to bring suit until after William's death."

*Id.*, 428 Pa. at 162, 237 A.2d at 217.

Thus, in *Elias* the claimant knew of his rights when he withdrew from the family business but failed to act on them until many years later, while here, appellee did not become aware of the mistaken basis of his choice to withdraw from Keystone's plan until after his retirement in 1972, and then he acted promptly. Furthermore, in *Elias* the defendant was prejudiced by the plaintiff's delay—a key witness had died. Here there was no such prejudice.

3

Appellants' argument that in permitting appellee to rescind his withdrawal from Keystone's plan, the court *en banc* ignored important evidence, may be stated as follows. According to appellants, the evidence does not show that the sole reason for appellee's withdrawal was the accountant's mistaken advice; appellants say that there were two other reasons for appellee's choice, which the lower court ignored: the inherent unfairness of appellee being a member of both plans when other employees were not eligible for both plans; and the close personal friendship between appellee and Robinson as Keystone's president. Appellants assert that rescission is not justified when mutual mistake was only one of appellee's three reasons for his choice to withdraw from the plan.

We have recently discussed the standard by which we must review the evidence in a case such as this one:

It is settled, however, that "the findings of fact of the [c]hancellor who heard the testimony without a jury, approved by the court en banc, are entitled to the weight of a jury's verdict; that such findings are controlling and that the court's decree should not be reversed unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Barbet v. Ostovar,*

273 Pa.Super. 256, 259–60, 417 A.2d 636, 638 (1979), *quoting Bogosian v. Foerderer Tract Committee*, 264 Pa.Super. 84, 89, 399 A.2d 408, 411 (1979); *Chatham Communications, Inc. v. General Press Corp.*, 463 Pa. 292, 297, 344 A.2d 837, 840 (1975). [footnote omitted] The chancellor's findings are especially binding where they are based upon the credibility of the witnesses. *See Herwood v. Herwood*, 461 Pa. 322, 336 A.2d 306 (1975); *Charles v. Henry*, 460 Pa. 673, 334 A.2d 289 (1975); *Scientific Living, Inc. v. Hohensee*, 440 Pa. 280, 270 A.2d 216 (1970); *Law v. Mackie*, 373 Pa. 212, 95 A.2d 656 (1953).

*Hankin v. Hankin*, 279 Pa.Super. 179, 197–200, 420 A.2d 1090, 1099–1100 (1980).

Here, the chancellor found—and the court *en banc* upheld the finding[4]—that appellee chose to withdraw from Keystone's profit-sharing plan because Robinson as Keystone's president told him that Keystone would not retain its tax advantages if he continued in both plans. In this regard, Robinson, on examination by appellants' counsel, testified as follows:

Q: And in 1962 did you become aware of the fact that the union had initiated a pension plan?

A: As it was brought out, there was a strike that lasted three or four weeks and the pension plan was one of the points of the strike, which the union won and the pension plan went in.

Q: Now, after the pension plan went in, did you have any discussions with your accountant in regard to the effect of the pension plan on people who were in the profit sharing plan?

A: Yes, we did.

Q: In addition, did you have any conversations—after the union contract went into effect, did you ever have any conversations with Mr. Fudala concerning whether or not he was covered by the plan?

A: By which plan?

4. Although the court *en banc* reversed the chancellor's disposition of the case, it did so only because of its conclusion that appellee's choice was subject to rescission.

Q: By the union pension plan.

A: He elected to go in the union pension plan.

Q: Well, how did that come about?

A: We had approximately twelve people in the office who were in the company plan and supervisory people who were in the company plan. When the union put their plan in, which included approximately forty different people in the office, there were two people, John Fudala and Charlie Schleeter, who would be in both plans if they stayed in the union. Now, this would have been, according to our accountant,—

 \* \* \* \* \* \*

THE WITNESS [Robinson]: The accountant said that it's not feasible from the Internal Revenue standpoint to make contributions to two plans for two people out of sixty people. These people have to decide whether they want to be in the office plan or the shop plan, not in both plans. Now, I presented that to John Fudala and Charlie at a meeting after four-thirty one night and told them. They elected to go in the union plan. I also told them the contributions which had been paid into the plan for approximately four or five years was their money. They could have it now if they want it. If they didn't want it, they could leave it there and draw interest and when they retired or whatever the final disposition is the money was theirs, that the money wouldn't be taken and pro rated over the other people in the plan, which is exactly what we did. We didn't take their money and distribute it to other people. It's their money and they got it. That's the summation of the whole meeting.

N.T. at 85–87.

Charles Schleeter, also called by appellants, testified as follows:

A: Well, we were told that we couldn't belong to two because of something, a technicality, and we had a choice of either to stay in that one, which would mean dropping your union book, or to stay in the union.

And if you stayed in the union, you would have the other benefits. You would lose it all if you dropped the book.

N.T. at 82.

This testimony represents ample evidence in support of the lower court's finding that appellee chose to withdraw from Keystone's plan because of the mistaken advice of Keystone's accountant.

It is true that Robinson testified that there was a second reason for appellee's choice:

At this particular time frame [Charles Schleeter] and Mr. Fudala were in the same status and I held a meeting and told both of them that on the advice of our accountant, since we were paying—the election would be up to them, whether they wanted to stay in our plan or go in the union plan, that on the advice of the accountant we couldn't deduct them for two plans. Secondly, it would be discriminatory to the people that were in this plan. Out of sixty people we couldn't have two people in two plans. So, they elected to go with the union.

N.T. at 15–16.

Furthermore, the lower court found what appellants say was a third reason, that appellee "was a close personal friend of Robinson and occupied a position of unusual responsibility and confidence." Finding of Fact No. 6, slip op. at 2. Appellants argue that

[t]he mistaken advice by the Accountant to Robinson may have instigated the discussion concerning pension plans, but the accountant's advice cannot be said to be the sole inducement or even an essential element of the inducement to [appellee] for his agreement and cooperation. Whether or not the mistake regarding the tax advantages had been present, the agreement would have been formulated. The law is clear that the misrepresentation or mistake must concern the inducement itself. Here, at least three [sic] other factors influenced [appellee] to participate in the agreement.

Appellants' brief at 17–18.

This argument, however, is mere speculation. We cannot know whether Robinson as Keystone's president would have asked appellee to choose between Keystone's plan and the union plan, if he had not been given erroneous tax advice. Nor can we appraise the effect, if any, of the possible inequities of appellee's being a member of both plans, or of appellee's close friendship with Robinson. It may be that the only effect was that appellee trusted and believed Robinson when he was told of the alleged tax consequences for Keystone if he remained in both plans. Perhaps, without the accountant's advice, Robinson would have chosen to keep appellee in both plans precisely because he was both a trusted employee and a close friend. In this regard, we note that during the 1962 strike appellee "offered to drop out of the union, but Robinson told him to go out on picket and paid him full salary while so engaged." Finding of Fact No. 7, slip op. at 2. In any event, it was for the lower court to decide the basis of appellee's decision to withdraw from Keystone's plan. So far as we are concerned, the dispositive fact is that the lower court's finding that appellee chose to withdraw from the plan because of the accountant's mistaken advice is supported by the record.

Affirmed.