Michael CARROLL, Administrator
of the Estate of Kelly Ann
Carroll, Appellant,

v.

Michael F. AVALLONE, D.O.
and Michael F. Avallone
Associates, Appellee.

Superior Court of Pennsylvania.

Argued April 13, 2004.
Filed Feb. 18, 2005.

Harry M. Roth and Karen R. Bramblett, Philadelphia, for appellant.

Ernest J. Bernabei, Philadelphia, for appellees.

BEFORE: DEL SOLE, P.J., ORIE MELVIN and BECK, JJ.

OPINION BY DEL SOLE, P.J.:

¶ 1 This is an appeal from a judgment entered in a medical malpractice action. We reverse in part and remand for proceedings consistent with this opinion.

¶ 2 Appellant's wife suffered a stroke from which she ultimately died. Appellant brought a medical malpractice claim, asserting both a wrongful death and a survival action, against Michael F. Avallone, D.O. and Michael F. Avallone Associates (collectively "Appellee"). The jury returned a verdict for Appellant, finding the decedent and Appellee each 50% negligent. Appellant was awarded $29,207 on the wrongful death action and nothing in the survival action. The award of $29,207 was reduced by 50% to $14,603.50 to reflect the apportionment of negligence. Appellee filed a motion to mold the verdict pursuant to the non-duplication of recovery provision of the Pennsylvania Property and Insurance Guaranty Association Act, which the trial court granted. Molding the verdict, Appellant's award was reduced to zero on the basis that the $21,981 in health insurance benefits received by Appellant subsumed the jury award.

¶ 3 Upon appeal, Appellant raises the following issues: whether the trial court erred in admitting evidence of illegal drug use; whether the trial court erred in cur-

tailing Appellant's cross-examination of Dr. Striar; and whether the trial court erred in not granting a new trial on damages where the verdict was inadequate and constituted an impermissible compromise verdict.[1]

## I. Evidentiary Challenge

¶ 4 Appellant's first issue concerns evidence of PCP and phenmetrazine in the decedent's system that was admitted at trial. Appellant first raised this issue in his Motion in Limine. Therein he contended that the Nazareth Hospital urine screen was inadmissible under *Frye*[2] and as hearsay; that the evidence of PCP in the decedent's blood and brain tissue, both taken during the autopsy, were inadmissible as hearsay and under *Frye*; that the evidence of phenmetrazine found in the decedent's urine at autopsy was inadmissible as hearsay and under *Frye*; that evidence from Appellee's experts that PCP and/or phenmetrazine caused or contributed to the decedent's death should be precluded under *Frye*; and that the medical examiner's opinion that drug intoxication was a significant condition in causing the decedent's death was inadmissible as hearsay. This motion was denied, and Appellant raises the same objections to this evidence on appeal. For ease of discussion, we have divided these issues into two challenges—the *Frye* challenge and the hearsay challenge.

¶ 5 "On a challenge to a trial court's evidentiary ruling, our standard of review is one of deference. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the

exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Herb,* 852 A.2d 356, 363 (Pa.Super.2004) (citations omitted).

### A. The *Frye* Challenge

■ ¶ 6 Preliminarily, as we review this *Frye* challenge, we are mindful that as an exclusionary rule of evidence, it must be construed narrowly so as to not impede the admissibility of evidence that would aid the trier of fact. *Id.*

■ ¶ 7 For expert testimony to be deemed admissible, *Frye* requires proof that the relevant scientific community generally accepts the methods and principles used by the expert in reaching a conclusion, however; there is no requirement that the expert's conclusions be similarly generally accepted. *Trach v. Fellin,* 817 A.2d 1102, 1112 (Pa.Super.2003).

■ ¶ 8 In the case presently before us, Appellant argues it was error under *Frye* to permit Appellee's experts to opine that illegal drugs caused the decedent's fatal stroke. The record reveals the only method used by both parties' experts in reaching their conclusions was a review of certain documents, including the decedent's hospital records and toxicology reports from the autopsy, and the application of their personal expertise. There is nothing novel about this method, *see Cummins v. Rosa,* 846 A.2d 148 (Pa.Super.2004), and so *Frye* does not apply. We note that Appellant is not challenging this method as novel; his quarrel instead is with the way in which these tests were carried out. He was afforded the opportunity to attack the

---

1. We have reordered Appellant's issues for the purpose of our discussion.

2. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

reliability of this testimony on cross-examination.

■ ¶ 9 We similarly find no merit in Appellant's *Frye* challenge to the toxicology screens and tests performed by the hospital and the medical examiner. Appellant argues that the tests lacked acceptance in the relevant medical community because they were not properly performed. First, Appellant points to the testimony of his expert toxicologist, Dr. Middleberg, in which he opined that the broad screens performed by the hospital and the medical examiner's office, which indicated the presence of PCP, should have been followed up with a second, more drug-specific screen that would confirm the initial result. N.T., 10/22/2002, at 144. Secondly, through the same expert witness, Appellant argues that the medical examiner engaged in "sloppy" testing procedures, and that this carelessness rendered the methodologies used unreliable. Brief for Appellant at 44.

¶ 10 Again, this is not a challenge of novel methods, but rather a challenge to the way in which common methods were executed. Because *Frye* applies only to novel methodologies, this challenge fails.

■ ¶ 11 Appellant also challenges the testimony offered by Appellee's expert, Dr. Judd. He argues that this testimony should not have been admitted because Dr. Judd did not perform independent research regarding the correlation of PCP and/or phenmetrazine and ischemic stroke, never treated a patient who suffered an ischemic stroke after ingesting PCP, and failed to cite research or studies to support his conclusion that PCP and/or phenmetrazine caused the decedent's fatal stroke. Brief for Appellant at 14. As we begin our discussion, we note that Appellant did not address this issue when he had the opportunity to do so on cross-examination of Dr. Judd, and as a result, presents us with a record not fully developed as to this issue.

¶ 12 This Court addressed a similar evidentiary issue in *Trach v. Fellin*, 817 A.2d 1102 (Pa.Super.2003), in which we ultimately held that an expert may employ the logical process of extrapolation in rendering an opinion in certain instances. In that case, the plaintiff was given a prescription for an antibiotic to treat an infection. Defendant, a pharmacy, filled this prescription but erroneously provided a different drug, the antidepressant Doxepin, at a much higher dosage than the prescription called for and also at a much higher dosage than is considered safe for that drug. *Id.* As a result, plaintiff suffered some permanent injuries, including open-angle glaucoma. *Id.*

¶ 13 At trial, plaintiff's expert opined that Doxepin was the cause of plaintiff's open-angle glaucoma. He testified as to how Doxepin works and its potential side effects. *Id.* He based this testimony on clinical trials involving recommended dosages, the manufacturer's package insert and the Physician's Desk Reference, a recognized authority in the medical profession. *Id.* These sources indicated potential side effects, including closed-angle glaucoma. *Id.* He did not rely on, present or discuss any literature concerning the effects of a dose the size of that taken by plaintiff or literature discussing Doxepin and open-angle glaucoma. In response, the defense highlighted this fact, and offered an expert witness who testified that no medical literature existed to indicate that Doxepin could cause open-angle glaucoma. *Id.*

¶ 14 In an effort to preclude this testimony, defendant filed a Motion *in Limine*, arguing that it did not meet the requirements articulated in *Frye*. Defendants' motion was denied and the testimony was admitted. After a verdict was returned in favor of plaintiff, defendant moved for

judgment n.o.v. or a new trial on the basis that plaintiff's expert's testimony should have been excluded, as neither his methods nor his reasoning process were proven to be generally accepted in the medical field. *Id.* The trial court granted a new trial, finding that "[Plaintiff's expert's] opinions on these issues were based on his own reasoning from general toxicological principles. There is no evidence that any other members of the medical community share his conclusions or concur in his reasoning process." *Id.* at 1113–14.

¶ 15 This Court disagreed with the trial court's reasoning. Looking at the process of plaintiff's expert, we found that he extrapolated his conclusions and opinions from the known adverse effects of that drug as documented in the clinical trials, package insert and the Physician's Desk Reference. We stated, "extrapolation . . . is not science: in fact, it is a logical method used 'to estimate the value of a variable outside its tabulated or observed range' or 'to infer (that which is not known) from that which is known.' " *Id.* at 1114 (citations omitted). We then held that extrapolation is an acceptable process for an expert to engage in, stating "as long as the basic methodology is sound . . . the scientist may extrapolate from this sound scientific basis when it is either impossible or unethical to perform the sorts of clinical trial that would yield definitive results." *Id.* at 1118.

¶ 16 Here, Appellee argues that Dr. Judd failed to point to support in the scientific community for his conclusion that PCP led to the decedent's fatal stroke. Brief for Appellant at 47.

¶ 17 The record does indicate that Dr. Judd fails to mention any such study in his testimony.[3] Dr. Judd did testify that the decedent had a history of hypertension,

N.T., 10/23/2002, at 120; the effects of PCP on the body, *Id.* at 131; the effects of PCP on blood pressure, *Id.* at 131; the impact of oral contraceptives on blood pressure and hypertension, *Id.* at 132; and the impact of oral contraceptives on hypertension and blood pressure. *Id.* at 132. Moreover, Dr. Judd's report discusses how PCP can lead to blood clots, and how the combination of PCP, cigarette smoking, oral contraceptives and hypertension can result in stroke. Report of James Judd, M.D., 9/30/2001. In light of this evidence, we find that Dr. Judd permissibly extrapolated his specialized knowledge as a medical doctor to the facts given to him in the *medical records and reports to arrive at* his conclusions regarding the effects of PCP on the decedent. That he did not have a study or an article addressing PCP and stroke does not indicate *per se* a lack of support for his conclusion in the scientific community or otherwise negate his expert opinion.

### B. The Hearsay Challenge

¶ 18 We find that Appellant's hearsay challenge is unfounded. Appellant argues that the autopsy toxicology report and hospital records were inadmissible hearsay, and that, therefore, the experts should not have been permitted to base their opinions on them.

¶ 19 The general rule is that a *medical expert may not merely repeat another's conclusion, but is permitted to express opinions based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession.* Collins v. Cooper, 746 A.2d 615 (Pa.Super.2000). The application of this rule "depends on the circumstances of each particular case

---

**3.** It also reveals that Appellant failed to question him about the existence of such a study.

and demands the exercise of the trial court's sound discretion." *Id.* at 618.

¶ 20 With regard to the statements at issue here, "[w]e recognize that a physician will often base his diagnosis on information obtained through other sources such as statements from patients, nurses' reports, hospital records, and laboratory tests. The fact that experts reasonably and regularly rely on this type of information to practice their profession lends strong indicia of reliability to source material, when it is presented thorough a qualified expert's eyes." *Woodard v. Chatterjee,* 827 A.2d 433, 444 (Pa.Super.2003) (citations omitted). Moreover, the record reflects that all medical experts, both for Appellant and Appellee, considered these documents in the formulation of their opinions, and they did not merely parrot the findings or statements therein. As such, we find no abuse of discretion by the trial court in permitting these documents to be considered by the expert witnesses.

II. Limitation of Cross–Examination

¶ 21 Appellant next argues that the trial court impermissibly limited his cross-examination of Dr. Striar, an expert witness for Appellee. The scope of cross-examination is within the sound discretion of the trial court. *Boucher v. Pennsylvania Hospital,* 831 A.2d 623 (Pa.Super.2003). Upon review, the appellate court will not reverse such a determination absent an abuse of discretion. *Id.* In its opinion, the trial court states that it limited Appellant's cross-examination only as to "irrelevant areas of inquiry and matters beyond the scope of direct examination." Trial Court Opinion, 12/8/2003, at 13. Upon reviewing the record, we find no abuse of discretion in this determination.

¶ 22 Appellant also argues that the jury returned an impermissible compromise verdict. A compromise verdict results when a jury, unable to apportion negligence on the part of the defendant and contributory negligence of the plaintiff, returns a verdict for the plaintiff but in a lesser amount than it would have had it been able to reach such conclusions. *Stokan v. Turnbull,* 480 Pa. 71, 389 A.2d 90 (1978). That is simply not the situation here. The jury found the decedent and Appellee each 50% negligent in causing death. As such, this argument fails.

III. Challenge to the Wrongful Death and Survival Action Award

¶ 23 Finally, Appellant argues that the damages awarded under the Wrongful Death Act were inadequate and that the failure to award damages under the Survival Act warrants a new trial. We address these issues mindful that a new trial will be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice, not where the evidence is conflicting or where the trial judge would have reached a different conclusion on the same facts. *Davis v. Mullen,* 565 Pa. 386, 773 A.2d 764 (2001).

¶ 24 A wrongful death action may be brought by the family of a decedent to recover the economic loss that it has incurred by the loss of the earnings which the decedent would have provided had the death not occurred, *Commonwealth v. Opperman,* 780 A.2d 714 (Pa.Super.2001), as well as the costs incurred by decedent's death. *Slaseman v. Myers,* 309 Pa.Super. 537, 455 A.2d 1213 (1983).

¶ 25 In contrast, a survival action belongs to the decedent. It is brought by the administrator of the decedent's estate to recover the loss to the estate resulting from the tort. *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1 (1994). The measure of damages under such an action include the decedent's pain and suf-

fering, the loss of gross earning power from the date of injury until death, and the loss of earning power, reduced to reflect personal maintenance expenses, from the time of death through the decedent's projected working life. *Id.*

 ¶ 26 Appellant's situation is similar to the situation faced by the appellant in *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1 (1994). *Kiser* involved wrongful death and survival actions brought by the parents of the decedent, a teenaged girl. At trial, in support of both the wrongful death and survival actions, the plaintiffs presented expert testimony that the net economic loss resulting from their daughter's death ranged from $232,400 to $756,081. *Id.* at 5. The defendant presented no evidence to refute this testimony, but only cross-examined the plaintiff's expert. *Id.* The jury returned a verdict of $25,000.

¶ 27 Noting that a jury is free to accept or reject the evidence it is presented, our Supreme Court found that where the jury is faced with uncontroverted evidence, the verdict must bear a reasonable resemblance to the proven damages. *Id.* "This is not a case in which the jury was entitled to disbelieve one expert in favor of another as only one expert was presented. Nor is this a case where the jury could completely discredit the testimony of [plaintiff's expert] as even under the scrutiny of extensive cross-examination his calculations yielded a net economic loss figure of $232,400. Instead, in this case, the jury totally disregarded the only evidence presented on the question of damages." *Id.* at 6.

¶ 28 In this instance, Appellant's expert testified that the total economic loss sustained by decedent's death, both by her family and by her estate, would be between $832,498 and more than $1,400,000. Appellee offered no contradictory evidence, and in fact did not offer any evidence at all. In light of this uncontroverted expert testimony, we find that an award of $29,207 bears no reasonable relationship to the proven damages, and remand for a new trial on damages alone.

¶ 29 Judgment reversed in part. Case remanded. Jurisdiction relinquished.

¶ 30 ORIE MELVIN, J. concurs in the result.