939 A.2d 872

**Michael CARROLL, Administrator of the Estate of Kelly Ann Carroll, Appellee**

v.

**Michael F. AVALLONE, D.O., and Michael F. Avallone Associates, Appellants.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2006.

Decided Dec. 28, 2007.

Ernest John Bernabei, John M. D'Amelio, Jr., Harvey, Pennington, Ltd., Philadelphia, for Michael F. Avallone Associates, appellants.

Harry Mitchell Roth, Cohen, Placitella & Roth, P.C., Philadelphia, for Michael Carroll, appellee.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice EAKIN.

Kelly Ann Carroll suffered a stroke and died. Decedent's husband, as administrator of her estate, filed a medical malpractice action against decedent's physician and his practice, asserting wrongful death and survival actions. A jury returned a verdict finding decedent and appellants each 50% negligent, awarding $29,207 in the wrongful death action and no damages in the survival action. After the verdict was reduced by the 50% negligence apportionment, appellee was awarded $14,603.50. Appellants filed a motion to mold the verdict. Pursuant to the Pennsylvania Property and Insurance Guaranty Association Act's non-duplication of recovery provision,[1] the court reduced the award to zero; appellee received $21,981 in health insurance benefits, which subsumed the award.

On appeal, the Superior Court affirmed various evidentiary rulings, but remanded for a new trial on damages. It concluded the evidence appellee's expert provided was uncontroverted because appellants offered no contradictory evidence; thus, the court held, the "award of $29,207 [bore] no reasonable relationship to the proven damages...." *Carroll v. Avallone, D.O.*, 869 A.2d 522, 529 (Pa.Super.2005). We granted allowance of appeal to consider whether the Superior Court erred in holding the damages awarded bore no reasonable relationship to the evidence presented at trial, and whether the evidence was "uncontroverted" within the meaning of our jurisprudence.

Appellee's expert, an actuarial economic consultant, testified decedent's lost earning capacity, fringe benefits, and past and

---

1. "Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy.... Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance." 40 P.S. § 991.1817(a).

future household services could be estimated between $832,498 and $1,486,713. The lower number was based on the assumption decedent became a nurse's aide; the higher number represented the economic loss had decedent become a licensed practical nurse (LPN). N.T. Trial, 10/23/02, at 75–76.

On cross-examination, the expert testified his numbers were based on the U.S. Life Table, a document which factors in all persons in the United States equally, regardless of any individual health factors or risk factors, which might have specific application to the decedent. *Id.*, at 83–84. Additionally, the expert conceded the number in his estimate would be reduced to zero if the unemployed decedent failed to return to the workforce. The expert acknowledged decedent was not working or enrolled in any LPN programs at the time of her death. *Id.*, at 83.

Appellants assert they presented sufficient evidence contesting appellee's damage estimates during cross-examination of appellee's expert; thus, the expert's testimony was not uncontroverted, and presented a factual question which the jury resolved. Appellants contend the expert's testimony regarding earnings was based on erroneous assumptions and should have been calculated at zero because decedent was unemployed when she died, was not enrolled in a nursing program, and had no plans to return to school.

Appellee counters that appellants' "evidence" decedent may never have returned to work is merely a speculative hypothetical, which is not sufficient to rebut his expert's opinion. Appellee also argues the admission of autopsy evidence showing decedent had illegal drugs in her system caused the jurors to ignore uncontroverted evidence regarding services decedent provided to her family.[2]

In reviewing an order granting a new trial, "our standard of review is limited to determining whether the trial court abused its discretion or committed an error of law."

---

**2.** Appellee presented an expert on causation, who discussed the effect of PCP and phenmetrazine, as they impacted decedent's health, given her history of hypertension, smoking, and use of oral contraceptives. This evidence was thus relevant and properly admitted.

*Neison v. Hines,* 539 Pa. 516, 653 A.2d 634, 636 (1995) (citations omitted). A new trial should only be granted where the jury's verdict shocks one's sense of justice because it is so contrary to the evidence admitted at trial. *Id.* It is the province of the jury to assess the worth of all testimony presented. *Id.* The jury is free to believe all, some, or none of the witness testimony presented at trial. *Id.,* at 637. However, the jury's verdict may be set aside if it is the product of passion, prejudice, partiality, or corruption, or if it is clear the verdict bears no reasonable relationship to the loss suffered by the plaintiff based on the uncontroverted evidence presented. *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1, 4 (1994).

Relying on *Kiser,* the Superior Court stated the expert's opinion on damages was "uncontroverted"; hence, the expert's evidence constituted "proven damages," meaning the award did not bear a reasonable relationship to the evidence (*i.e.,* the range in the expert's direct testimony). *Carroll,* at 529. The question now involves the meaning of "uncontroverted," as applied to the principles set forth in *Kiser,* and whether a defendant's failure to present independent evidence on damages comprises *de jure* acquiescence to a plaintiff's expert's testimony.

In *Kiser,* the expert testified the net economic loss resulting from the teenage decedent's death was between $232,400 and $756,081.43. *Kiser,* at 5. As here, the defense did not present its own expert, but extensively cross-examined the plaintiff's expert. The $232,400 figure was conceded only after defense counsel suggested the 40% "personal maintenance" deduction, as originally applied, was low and that a 70% deduction was appropriate. *Id.* The expert testified he would reduce the net economic loss to $232,400 on the bottom end of the range. *Id.* This Court stated, "Thus, the uncontroverted testimony at trial was that the net economic loss that would result from Ms. Kiser's death ranged from $232,400.00 to $756,081.43." *Id.* That is, what was uncontroverted was the minimum estimate of $232,400, which was conceded after cross-examination. The original range was not uncontroverted simply because the defense presented no evidence--the cross-examina-

tion challenged that evidence. Therefore, the jury award of about 11% of the uncontroverted range was inadequate.

Here, cross-examination of appellee's expert did not focus on the maintenance percentage, but dealt with the factual presumptions underlying the range of figures given. While the expert based his testimony on a presumption decedent would return to work in the nursing field, appellants presented evidentiary factors not consistent with her imminent return to work: evidence about her acknowledged lack of plans to return to work, her long-term health problems, her employment history in fields the expert did not consider, and the presence and effect of specific illegal drugs in her body at the time of her death. *See generally* N.T. Trial, 10/21/02, at 250–52; N.T. Trial, 10/23/02, at 82–88.

The evidence admitted at trial, therefore, does not allow the conclusion the expert's opinion was "uncontroverted." *Kiser* did not treat the direct testimony as uncontroverted, as cross-examination challenged the calculation. *Kiser* does not stand for the proposition that the lack of an expert counter-opinion renders the first expert's opinion uncontroverted. A basic factual challenge to the underpinnings of the expert's opinion was made here. While it is speculative to presume decedent would never return to work, it is also speculative to presume she would have done so in any of the capacities the expert considered. There was evidence calling all of this into question; at the very least, the timing and capacity of her potential return to work was at issue, rendering the expert's evidence controverted.

The concept of *Kiser*, that the verdict must bear a relation to the evidence, is in tension with the notion that a jury may reject any evidence offered, even if uncontroverted; a jury is not obliged to believe or disbelieve any evidence presented at trial, including an expert's opinion. However, a jury's verdict cannot be based on whim or caprice, hence the holding in *Kiser*.

Thus, if there is no argument or opposition on a particular point, the jury may not be free to disregard such information. Indeed, to "controvert" means "[t]o raise arguments against;

voice opposition to." The American Heritage College Dictionary, Third Edition 303 (2000). "Uncontroverted" evidence, therefore, is evidence which is unopposed or unchallenged, not merely uncontradicted. If one party has the burden of proof, opposing counsel may strenuously controvert the evidence through cross-examination and argument; reasons not to accept the plaintiff's evidence may suffice to prevent the meeting of that burden, even without affirmative countervailing evidence.

The evidence here was not uncontroverted, and the expert's opinion did not amount to "proven damages." Appellants' counsel challenged the underlying facts supporting the opinion of loss posed by appellee's expert witness; it was admitted by the expert that if decedent never returned to the workforce, her net economic loss would be zero. Indeed, every scenario concerning the net economic loss of decedent was based on speculation as to whether she would have returned to work, and if she returned to work, in what capacity she would be employed. Appellants did not concede she would return in any capacity mentioned by the expert, and the jury was free to consider both his testimony on direct examination and his admissions during cross-examination. Thus, we cannot say the jury award did not bear a reasonable relationship to the evidence as it was admitted at trial.

The Superior Court held the failure to present affirmative evidence makes the other party's opinion evidence uncontroverted, rendering it "proven damages" that must be reflected in the jury's verdict. *Carroll,* at 529. Such an extension of *Kiser* is not in consonance with our jurisprudence. Accordingly, the Superior Court's order granting a new trial on damages is reversed. Jurisdiction relinquished.

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY, Justice CASTILLE and Justice BALDWIN join the opinion.

Justice SAYLOR files a concurring and dissenting opinion in which Justice BAER joins.

Justice SAYLOR, concurring and dissenting.

I agree with the majority's holding that Appellants sufficiently challenged the damages evidence with regard to Appellee's survival action such that the jury's award in that action should not have been disturbed on appeal. As the majority observes, Appellants extensively cross-examined Appellee's expert on damages in the context of the possibility of Decedent Kelly Ann Carroll's return to employment and the extent of economic loss if such an assumption was not realized or if she returned to work in a capacity different than initially contemplated by the expert. *See* Majority Opinion, at 681–82, 939 A.2d at 875–76. Given this cross-examination and the resulting admissions, the evidence was sufficiently disputed to support the jury's award for the survival action, obviating the need for a new trial on damages for that action. *See generally Kiser v. Schulte,* 538 Pa. 219, 226–27, 648 A.2d 1, 4 (1994) (explaining that a survival action, brought by the administrator of the estate, is designed to recover damages for the decedent's pain and suffering, the loss of gross earning power from the time of injury to death, and the loss of earning power, less personal maintenance expenses, for the estimated working life span of the decedent).

I disagree, however, with the majority's holding to the extent that it does not award a new trial on damages for Appellee's wrongful death action. *See id.* at 226, 648 A.2d at 4 (stating that a wrongful death action is designed to compensate the spouse, children and parents for the loss they have sustained as a result of the death, including the present value of services that would have been rendered to the family, as well as funeral and medical expenses). In this regard, Appellee's expert opined that the value of Decedent's household services over the course of her lifetime would have been in the amount of $414,960. *See* N.T. 10/23/2002 at 73. Appellants' cross-examination on this figure was limited to questioning whether it would be decreased if Appellee had assumed greater household chores. *See id.* at 88.[1] This cross-examination

---

1. Although asserted in the context of the loss of earnings determination, it is arguable that, by challenging the expert's calculation of Decedent's life expectancy based upon her hypertension and smoking, Appellants

was not as extensive as the questioning surrounding Decedent's potential earnings and, in my view, did not adequately controvert the testimony from Appellee's expert. That being the case, I believe that the jury's award of $29,207 in the wrongful death action, the stipulated amount for the medical bills and funeral expenses resulting from Decedent's death, did not bear a reasonable relation to Appellee's uncontroverted evidence of the damages recoverable in such an action.[2]

Finally, I would refrain from discussing the propriety of the admission of the evidence surrounding the presence of PCP and phenmetrazine in Decedent's system, as well as the causation evidence offered by Appellants on this point. *See* Majority Op. at 679 n. 2, 939 A.2d at 874 n. 2. The sole issue before this Court involves the Superior Court's award of a new trial on damages based upon its determination that the jury's award bore no reasonable relationship to the proven damages. Appellants did not focus upon the presence of PCP and phenmetrazine during the cross-examination of Appellee's damages expert and did not argue to the jury that the existence of these substances should affect the determination of damages for either the wrongful death or survival actions.

Accordingly, I would reverse the Superior Court's award of a new trial on damages for the survival action, but would affirm its holding with respect to the wrongful death action.

Justice BAER joins this concurring and dissenting opinion.

also were disputing the total value assigned by the expert to the loss of Decedent's household services. *See* N.T. 10/23/2002 at 83–84.

2. The majority appropriately notes that *Kiser* is in tension with the notion that a jury may reject evidence; further, it is in tension with this Court's acceptance of the possibility of compromise verdicts. *See Stokan v. Turnbull*, 480 Pa. 71, 77–78, 389 A.2d 90, 93 (1978). Nevertheless, Appellants do not argue that *Kiser* should be overruled, but rather, merely differ with its proper interpretation. Thus, our analysis is confined to an application of the decision.