J-A16030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| WILLIAM N. NOVAK AND STACY NOVAK, HIS WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MARY PAULINE NOVAK | |
| Appellant | No. 1521 WDA 2013 |

Appeal from the Judgment Entered October 31, 2013
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 4095 of 2011

BEFORE:  DONOHUE, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                              **FILED SEPTEMBER 16, 2014**

Mary Pauline Novak (Novak) appeals from the judgment entered in favor of William N. and Stacy Novak (Son)[1] in the Court of Common Pleas of Westmoreland County on October 31, 2013.[2]  Judgment was entered following a non-jury trial regarding a contract between Novak and Son, requiring Novak to repay a loan.  In this timely appeal, Novak claims the trial court erred in (1) rejecting the unequivocal and unambiguous testimony

_____

[1] For ease of reference, we will refer to William N. and Stacy Novak (son and daughter-in-law) as Son.

[2] The appeal in this matter was filed on September 17, 2013, 44 days prior to the entry of judgment.  However, pursuant to Pa.R.A.P. 905(a)(5), we accept the appeal as properly filed.  **See also America and Foreign Ins. Co. v. Jerry's Sport Center, Inc.**, 948 A.2d 843 (Pa. Super. 2008), aff'd, 2 A.3d 526 (Pa. 2010); **Thomas v. Elash**, 781 A.2d 170 (Pa. Super. 2001).

of the handwriting expert, (2) rejecting Novak's evidence that her signature on the contract was a forgery, and (3) ascribing a lack of credibility to certain statements made by Novak. After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm.

We adopt the factual and procedural history of this matter is set forth in the Decision and Order of May 21, 2013, at pages 1 through 10, authored by the Honorable Gary P. Caruso, President Judge.

At trial Novak produced the expert testimony of Michelle Dresbold, a forensic handwriting analyst, who opined that the signature purporting to be Novak's on the loan agreement was a forgery. See N.T. Trial, 4/15/2013, at 234.

After considering all of the evidence presented, the trial court found in favor of Son and ordered Novak to repay Son the amount of $34,450.31 and additionally directed Novak to devise the property to Son upon her death, further enjoining her from otherwise transferring or conveying the property during her lifetime.

> The relevant standard of review of a court's decision in a non-jury trial is as follows:
>
>> [We are] limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all

> evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.
>
> ***Croyle v. Dellape***, 832 A.2d 466, 470 (Pa. Super. 2003) (citing ***Behar v. Frazier***, 724 A.2d 943, 946 (Pa. Super. 1999)). The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, "unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." ***Fudula v. Keystone Wire & Iron Works, Inc.***, 283 Pa. Super. 502, 424 A.2d 921, 927 (1981).
>
> > Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.
>
> ***Miller v. Sacred Heart Hosp.***, 753 A.2d 829, 832 (Pa. Super. 2000)(internal citations omitted). "To the extent that the trial court's findings are predicated on errors of law, we review the court's findings *de novo.*" ***John B. Conomos, Inc. v. Sun Co., Inc. (R & M)***, 831 A.2d 696, 704 (Pa. Super. 2003), *appeal denied,* 577 Pa. 697, 845 A.2d 818 (2004).

***Hart v. Arnold***, 884 A.2d 316, 330-31 (Pa. Super. 2005).

Novak's first two issues are similar and we will address them together. First, she claims the trial court erred in disregarding the "unequivocal and unambiguous testimony of the handwriting expert." Relatedly, she argues the trial court erred in concluding the loan agreement was not forged.

Novak's first issue is essentially a challenge to the weight of the evidence. "The weight assigned to expert testimony lies within the sole province of the jury, and it is free to believe all, part or none of the evidence." ***Potochnick v. Perry***, 861 A.2d 277, 286 (Pa. Super 2004)

(citation omitted).[3] Novak's expert opined the signature on the contract was forged. Son presented no opposing expert testimony and Novak claims other competent evidence supported the expert's opinion. Therefore, she argues the trial court erred in disregarding the expert's opinion.

Initially, we note that the trial court based its determination that Novak agreed to repay Son on other evidence and did not make a determination regarding the authenticity of the signature. However, the failure to accept Dresbold's opinion does not represent error. Dresbold opined the signature was forged. She noted there were some similarities between the contested signature and exemplars, but the significant differences outweighed the similarities. Nevertheless, Dresbold also admitted that a true signature, found on a check that Novak admitted writing, was also significantly different, thereby indicating Novak signed her name in a variety of manners. In addition, Son testified he witnessed his mother sign the document, which directly contradicted Dresbold's assertion of forgery. Therefore, there was an evidentiary basis for the trial court to disregard Dresbold's opinion. Here, the trial court based its decision regarding Novak's responsibility to repay Son on the totality of the other evidence, and not at all on the authenticity of the signed agreement. The

_____

[3] This rule applies generally to a fact-finder's ability to assess the credibility and determine the weight given to all witnesses, not just experts. **Carroll v. Avallone**, 939 A.2d 872, 874 (Pa. 2007).

trial court was presented with evidence of the history of payments by Novak, the testimony of Pauline Howell (testifying Novak admitted owing Son the money) and Attorney Duffy (testifying to the overall circumstances of the transaction), and the debt incurred by Son to obtain the house payment, all of which supported Son's assertion that Novak understood the money from Son was a loan, not a gift, and required repayment. As noted, the trial court, sitting as fact-finder, was entitled to believe all, some or none of Dresbold's testimony. Because the record supports the trial court's rejection of Dresbold's conclusion, there is no error to be ascribed.

The second part of Novak's argument, that the trial court erred in not finding the document was a forgery, was based entirely on the assertion that the trial court erred in disregarding Dresbold's testimony. Because the trial court did not err in that regard, this argument must fail.[4] Therefore, Novak is not entitled to relief on these issues.

In her final issue, Novak argues the trial court erred in determining she was incredible based upon certain statements she made that were otherwise contradicted by competent evidence. Specifically, the number of times she visited the attorney, whether the attorney was present at the

---

[4] We acknowledge that the trial court's failure to explicitly make a finding as to the contract leaves open the possibility that Novak's signature was forged. Written document notwithstanding, the trial court found sufficient evidence to explicitly determine that Novak and Son entered into a valid agreement to repay Son.

closing, and her failure to recall signing the deed or where she signed the Will.

As noted above, the fact-finder is free to believe all, some or none of a witness's testimony. **Carroll v. Avallone**, **supra**. However, Novak claims it was incorrect to discredit her credibility as a whole when her failures to recall certain facts were simply instances of the failing memory of a 73 year-old woman. **See** Novak's Brief at 8. Novak fails to understand that the inability to recall accurately salient facts, no matter the reason, is a central aspect of credibility. **See Commonwealth v. Boich**, 982 A.2d 102, 105 (Pa. Super. 2009) (inability to recall material facts affects credibility). The determination that her testimony was incredible does not necessarily mean that the trial court thought she fabricated her testimony. If the details surrounding her testimony were unreliable, either intentionally or by reason of failing memory, the trial court was within its rights to discount that testimony. Novak has not claimed, nor is there any indication that the trial court based its determination of credibility on "passion, prejudice, partiality or corruption." **Carroll**, **supra**. Accordingly, we find no abuse of discretion or error of law in the trial court's finding that Novak testified incredibly.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/16/2014

IN THE COURT OF COMMON PLEAS OF WESTMORELAND
COUNTY
PENNSYLVANIA
CIVIL DIVISION

WILLIAM N. NOVAK AND
STACY NOVAK, HIS WIFE,
PLAINTIFFS,

V.                                                    NO. 4095 OF 2011

MARY PAULINE NOVAK,
DEFENDANT,

## DECISION AND ORDER

This matter is before me for disposition as the result of a non-jury

trial. Having heard such oral testimony as the parties chose to introduce and

examined the pertinent exhibits and reviewed testimony and heard oral

arguments and considered written submissions, I make the following

findings based upon the credible evidence and the reasonable inferences to

be drawn there from.

This is an unfortunate case of a son and daughter in-law suing their

mother and mother-in-law. It appears that after the husband of Mary Pauline

Novak passed away, her physical condition deteriorated. Although William

Novak and his mother, Mary Pauline Novak, had not gotten along for quite

some time, William's wife Stacy began helping Mary, more and more.

Mary related how she wanted to get out of the house that she then lived in.

1

William spoke to his mother about purchasing a home from the estate of Dorothy J. Funk. Mary was happy with this idea. Mary, William and Stacy all went to look at the home in February 2009. They discussed making some renovations to the bathroom and changing the paneling to plastering. They discussed making an offer of $75,000 for the house. There was a discussion between Mary, William and Stacy concerning how the purchase would be funded. Mary said she could put up $40,000. William said he could provide the balance. This balance of $36,000.00 was to be paid back by Mary at the rate of $300 per month over 10 years interest-free. When Mary died William was to receive the property. Based on this agreement, Mary, William and Stacy moved forward with the purchase of the real estate from the estate of Dorothy J. Funk. They went to Attorney James Duffy to discuss this purchase.

The parties met with Attorney James Duffy in January or February of 2009. William Novak expressed to him a desire to improve his mother's situation. He wanted to assist her in the purchase of a new home and make any necessary modifications and or repairs to the new home. It was explained to Attorney Duffy that both parties, William Novak and Mary Novak were to contribute to the purchase. Each one would contribute about

Novak, widow, and the grantees are William Novak and Stacy Ann Novak, husband and wife. This deed is dated April 2, 2009. It was a deed for the same property that was conveyed to Mary from the estate of Dorothy J. Funk. Attorney Duffy gave the original of this deed to Mary Pauline Novak to hold in escrow. This deed is further evidence of Mary's actual intention to provide that the property would pass to William Novak.

In 2010 Attorney Duffy wrote to Mary because William had contacted him about problems with his mother reneging on the agreement that he was to receive this property. William did tell Attorney Duffy that his mother had made some payments to him pursuant to an agreement but had stopped making those payments. On February 1, 2010 Attorney Duffy wrote to Mary Pauline Novak. By that letter, Attorney Duffy suggested that Mary and William enter into a mortgage in order to protect Williams's position against other potential creditors or in the event she would sell the property. Then on September 28, 2010 he again wrote a letter to Mary Pauline Novak. In this letter, he suggested that the deed that had been prepared and delivered to Pauline be placed in the hands of a neutral third party. He even suggested letting his office hold the deed in escrow. It had become evident to Attorney Duffy that Mary was disavowing the agreement she had reached with William when William gave her the $36,000.

4

The last Will and Testament, and the deed that Mary Pauline Novak requested Attorney Duffy to prepare, was consistent with William's recollection of the original agreement between himself and Mary Pauline Novak. Attorney Duffy did not recall any discussion concerning immediate repayment of the money that William had given to Mary to allow her to purchase the new property. He did recall discussions about extensive work that had to be done on the property by William. Attorney Duffy only became aware of the arrangement for repayment by Mary after the closing of the real estate transaction.

At the original meeting held between Mary, William and Attorney Duffy, wherein the discussion was held concerning William ultimately receiving this property if he provided to her monies to assist in the purchase along with making repairs and modifications, Mary did not express any disagreement nor objection to what William was requesting of Mr. Duffy. She also participated in the discussions.

William and his mother discussed the fact that the property was to be placed in her name alone, so she could receive government assistance. This arrangement was discussed at the time of the closing. Prior to closing

William was not aware of his mother's intention to place the property in her name alone.

William had requested that his mother sign a document evidencing her obligation to repay him as they had agreed. William drafted the document, and he and Stacy signed it on March 30, 2009. On April 2, 2009 Mary came to the house in order to give William the Last Will and Testament that she had Attorney Duffy prepare. At that time William gave her a contract that he had drawn up to sign. William testified that Mary signed the contract. He further testified that the manner in which Mary signed it was that William laid the document on the seat of the truck and Mary leaned into the truck to sign it on the seat of the truck. However, at that time, Mary did not give him the deed that had been prepared. Mary moved into the property around Mother's Day of 2009. Between the closing and Mother's Day William renovated the entire inside of the house.

After Mary had moved in, she and William discussed when payments would begin under their agreement. Mary did not want to pay the first month, and therefore began paying in July 2009. She paid three other months in cash. The payments were being made on a random basis. The first two months, she did pay $300. Then she started paying less. She would advise William that she could not afford to pay the $300. In the fall

6

of 2009, there was more conversation between William and Mary about her inability to pay the amount due pursuant to the agreement, as well as the taxes on the property. Mary advised William that if he wanted to receive his money he would have to make a room available where she could perform her dog grooming services. Therefore, in September 2009 William made the repairs to the room, which repairs were completed by the end of October. William also brought in outside contractors to perform the work on the home. He hired contractors that in total cost him $12,133.00. Mary had given him $3,000.00 for the remodeling of the bathroom. This remodeling of the bathroom had nothing to do with the work that the contractors performed and that was paid for by William.

From December 2009 to September of 2010 there were no direct communications between Mary and William. All that occurred were messages left on voicemail. In mid-September 2010 William went to Mary's home. However, she would not answer the door. She merely looked out the window. Finally she came out of the house and advised William that she did not believe she owed him any money. She told him to leave or she would call the police. When the police arrived, William told them the entire story and they left without filing any charges or making an arrest.

7

William never asked for payment for any of the renovations he performed on the property, because he believed that Mary was to devise the property to him at her death.

There was a time when Mary agreed to pay William $20,000 if she sold her home in Skellytown. However, upon the sale of this house she did not follow through on that promise.

In order to obtain the money that was needed to help Mary purchase the home from the Funk estate, it was necessary for William and Stacy to take out a line of credit.

There were a number of monthly payments made by Mary Novak to a William and Stacy. In July and August of 2009 she paid $300 each month. In September she paid $200.00. In October, she paid $100. In November, she paid $100. In December, she paid $150. In January 2010 she paid $100. In February she paid $100. In March she paid $100 and in April she paid $100. In April 2010 she made her last payment. She made total payments of $1,550.00.

There was an occasion in the spring of 2010 when Pauline Howell visited Mary. On this visit they discussed the funding for the purchase of her new home. Mary told Ms. Howell that she and William purchased the home together. Mary did discuss with Pauline Howell the fact that she could

not afford the $300 per month payment to William. Thus, confirming the existence of the agreement to do so. The Defendant complained to Pauline that the taxes on the residence were too high and she could not afford the monthly repayment. Pauline even suggested that the Defendant speak to William and request that she only pay $100.00 per month and Pauline said she would assist in this regard. Mary also told Ms. Howell that the reason the property was not placed in the name of William was so that she could receive government assistance. All of this is further evidence that she had made the alleged agreement with William.

Mary Pauline Novak denies that she ever agreed to a loan or to repay the money that had been given to her by William. She further testified that she decided she would do something for William. Therefore, she made out a Last Will and Testament in which William would get everything. She said she decided to do this after the closing. Mary also claims that she gave William $50,000, and not $36,000.

All of the evidence establishes that Mary was at attorney Duffy's office twice. She however contends she was only there once. She also states that the only reason she made any monthly payments at all is because William was harassing her and said he needed money and she did it just to get him off of her back. She also contends that she does not recall signing

9

the deed prepared by Mr. Duffy dated April 2, 2009. She also claims she doesn't remember receiving it from Mr. Duffy and doesn't know where the original is at this time. I find the testimony of Mary Pauline Novak on these matters to be incredible.

She also states that Mr. Duffy was at the closing and Mr. Duffy clearly testified he was not. She also testified that she did not sign the Will while in the office of Mr. Duffy, although it was signed and witnessed and notarized by Mr. Duffy. She even denies signing the sales contract. I also find her testimony on these matters to be incredible.

The First Count of the Plaintiffs' Complaint is for Breach of Contract. It is reasonable and required that I look at the acts of the parties in my determination of whether there existed a contract between the parties. In this case, I find that the Plaintiffs advanced the sum of $36,000.00 to assist the defendant in the purchase of a residence for $75,000.00. The Defendant contributed the balance of $39,000.00 from her own funds. Following the closing of this purchase the Defendant executed a quitclaim deed to the Plaintiffs. She also changed her Last Will and Testament to make both Plaintiffs her sole beneficiaries to the express exclusion of all other potential heirs. Within two (2) months after she moved into the residence she began making payments in accordance with the alleged agreement. William

10

Novak, in accordance with the agreement, made repairs and improvements to the property at his own cost. The Defendant subsequently sold her prior residence and retained the proceeds of that sale. All of these actions are precisely in accordance with the alleged agreement.

The Defendant's asserted reason for making the monthly payments in accordance with the agreement is not consistent with common sense. The Defendant states that she made the payments only because William Novak was harassing her and caused a scene at her residence while demanding repayment. She then states that ten months later William told her to forget about what she owed him. This just defies logic and common sense. I find that she made the payments because she had agreed to do so.

In further support of the agreement the Plaintiffs admitted into evidence as Exhibit 11 a document that was allegedly signed by the Defendant. This document acknowledges the $36,000.00 debt of the Defendant and her obligation to repay it. The Defendant claims that her signature on the document is a forgery. "The party relying on fraud or forgery has the burden of proving the facts upon which the alleged fraud or forgery is based and these facts must be proved by evidence which is clear, direct, precise and convincing: Molden Will, supra [387 Pa. 484]; Petro v. Secary Estate, 403 Pa. 540, 543, 170 A. 2d 325; see also: Williams v.

McCarroll, 374 Pa. 281, 292, 97 A. 2d 14. William recalled the day that the document was signed by Mary because she had come from Attorney Duffy's with a stack of papers. From the testimony, if this was the day that the Defendant visited Attorney Duffy, it can be determined that the date was April 2, 2009. The document allegedly signed by the Defendant has the date of March 30, 2009 written next to the signature purporting to be that of the Defendant. William explained that he put that date on the document and did so the day that he and his wife signed the document. This does cast a cloud upon the authenticity of the signature appearing thereon. However, all of the other evidence I have to consider causes me to be unable to decide by a preponderance of the evidence that the Defendant did not sign the document in question. Nor can I conclude by a preponderance of the evidence that she did sign the document

It is true that the Defendant called a handwriting expert. It has been stated that "opinion evidence of an expert, whether he be a doctor or any other kind of expert, is, in cases of forgery, undue influence, mental capacity and insanity, of very little weight and cannot prevail against direct factual credible evidence: Pochron Will, 367 Pa. 306, 80 A. 2d 794; Peterman Will, 367 Pa. 302, 80 A. 2d 792; Porter's Estate, 341 Pa. 476, 19 A. 2d 731; Snedaker Estate, 368 Pa. 607, 84 A. 2d 568; Sturgeon Will, 357 Pa. 75, 53

12

A. 2d 139; <u>Cookson's Estate, 325 Pa. 81, 88, 188 A. 904</u>; <u>De Maio Will, 363 Pa. 559, 563, 70 A. 2d 339</u>; <u>Commonwealth v. Woodhouse, 401 Pa. 242, 259, 260, 164 A. 2d 98</u>." After considering the testimony of the expert and all of the physical evidence available to me I am unable to conclude by a preponderance of the evidence that the Defendant did not sign the document. Nor can I conclude by a preponderance of the evidence that she did sign the document.

Based upon all of the evidence before me for my consideration, I find that it is more probable than not that the Defendant, Mary Pauline Novak agreed as alleged by the Plaintiffs, William and Stacy Novak, to pay the sum of $36,000.00 to William and Stacy Novak in increments of $300.00 per month, or a greater or lesser amount per month by mutual agreement of the parties and had agreed to devise the property to William at her death in consideration of the financial contribution he made to her purchase of the property and the repairs and improvements he made to the property; thus she is contractually bound to pay the amount due as well as to devise the property to William at her death. Therefore, I will enter to following Order/Verdict.

13

IN THE COURT OF COMMON PLEAS OF WESTMORELAND
COUNTY
PENNSYLVANIA
CIVIL DIVISION

WILLIAM N. NOVAK AND
STACY NOVAK, HIS WIFE,
PLAINTIFFS,

VI.

NO. 4095 OF 2011

MARY PAULINE NOVAK,
DEFENDANT,

ORDER/VERDICT

And now this 21ˢᵗ day of May, 2013, in accordance with the foregoing I enter a verdict in favor of the plaintiffs and against the defendant; and

It is further Ordered that the defendant reimburse the plaintiffs the sum of $34,450.31 pursuant to the terms of their agreement; and

It is further Ordered that the defendant is required to devise the property to the plaintiffs upon her death and is enjoined from otherwise transferring or conveying the property during her lifetime.

By the Court:

_Mary P. Caruso_

Attest:

_____

14