J-A28008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| JAMES MCGEE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| ST. LUKE'S HEALTH NETWORK D/B/A ST. LUKE'S HOSPITAL & HEALTH NETWORK, AND JOHN P. BRUNO, DO, MBA. | |
| Appellee | No. 425 EDA 2016 |

Appeal from the Judgment Entered February 2, 2016
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2012-C-5192

BEFORE:  PANELLA, J., SHOGAN, J., and PLATT, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED MARCH 07, 2017**

Appellant, James McGee, appeals from the judgment entered after the trial court denied his post-trial motion for a new trial on damages and granted appellees', St. Luke's Health Network ("St. Luke's" or "the hospital") and John P. Bruno, D.O., M.B.A., post-trial motion for remittitur. McGee contends that the jury's verdict for his breach of contract claims bore no relation to the evidence at trial, and he therefore is entitled to a new trial on damages. In the alternative, he argues the trial court committed an error of law by ignoring an alleged compromise verdict reached by the jury and reducing the verdict by $51,998. After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

Dr. McGee was employed by St. Luke's as an attending physician when, in September 2005, the hospital suspended him. St. Luke's imposed the suspension pending an investigation into allegations of conduct that violated Dr. McGee's employment agreement. St. Luke's subsequently terminated Dr. McGee's employment.

Thereafter, at Dr. McGee's request, Dr. Bruno, St. Luke's Vice President for Medical Affairs, sent a reference letter to a third party hospital from which Dr. McGee was seeking employment. Dr. Bruno referenced the investigation, and the allegations that instigated it. The allegations conveyed by Dr. Bruno's letter were that: (1) Dr. McGee failed to provide a screening exam for a patient that had presented at St. Luke's emergency room ("ER"); (2) Dr. McGee had dated a patient; and (3) Dr. McGee had written a prescription for his personal use in the name of another individual. Dr. Bruno asserted that the results of the investigation led the hosptial to terminate Dr. McGee's employment.

In 2008, Dr. McGee instituted an action against St. Luke's and Dr. Bruno, which ultimately asserted that the defendants had defamed him and interfered with his current and prospective business relations. In 2009, the parties presented the terms of a settlement agreement on the record. The trial court approved and adopted this agreement as an order of court.

Attached to the court order was a form letter which St. Luke's was directed to use in all future communications regarding Dr. McGee's

employment by the hospital. The form letter stated that "St. Luke's Hospital terminated its employment agreement with Dr. McGee effective September 30, 2005 for what it considered the exercise of poor judgment." Furthermore, the letter provided two bases for St. Luke's conclusion that Dr. McGee had exercise poor judgment: (1) that Dr. McGee had not performed a screening exam on a patient that had presented at St. Luke's emergency room; and (2) that Dr. McGee had prescribed a narcotic to a patient/friend, and had subsequently used the portion of the prescription unused by his patient/friend to treat his own injury. The letter does not reference any allegation that Dr. McGee had dated a patient.

Over the next four years, St. Luke's and Dr. Bruno consistently utilized the form letter when requested to provide a reference for Dr. McGee. However, twice in 2011 Appellees sent an alternate letter that contained an allegation that St. Luke's Hospital had terminated Dr. McGee's employment "for what [it] considered the exercise of poor judgment in the handling and treatment of patients and medications." Furthermore, the letter provided not only the two bases for St. Luke's conclusion that were contained in the agreed upon form letter, but also the allegation that Dr. McGee had "dated a woman who had previously been admitted and discharged as his patient."

St. Luke's sent the first of these letters to the Arizona Medical Board, which was reviewing Dr. McGee's application for medical privileges in the state of Arizona. In his reply brief, Dr. McGee concedes, "there is no

evidence that Dr. McGee suffered damages as a result of the [Arizona Medical Board] breach." Appellant's Reply Brief, at 16.

St. Luke's sent the second letter to Carlisle Regional Medical Center ("CRMC") which was considering employing Dr. McGee in its emergency room through CRMC's contract with a staffing company, EMCare. After receiving the letter from St. Luke's, CRMC declined to grant medical privileges to Dr. McGee and he was denied employment in the emergency room.

After several rounds of contentious back and forth with St. Luke's and its agents, Dr. McGee discovered the existence of the two reference letters that did not follow the agreed upon form letter. Dr. McGee subsequently filed suit, asserting that St. Luke's and Dr. Bruno had defamed him, interfered with his past and future business relationships, and breached the settlement agreement.

At trial, Appellees' defense centered on a theory that the letters did not cause any damage to Dr. McGee. Appellees argued that Dr. McGee's own misrepresentations in his applications to CRMC and the Arizona Medical Board were the cause of any lost earnings. Appellees did not present any expert to rebut the expert testimony provided by Dr. McGee regarding the amount of damages.

The jury returned a defense verdict on all tort claims, but found in favor of Dr. McGee on his two breach of contract claims. On each claim, the

jury allocated $26,000 of liability against St. Luke's and Dr. Bruno. In response to a request for clarification, the jury indicated that the overall award would be $26,000 against each defendant for each breach, and therefore the total award would be $104,000.

Both parties filed post-trial motions. Dr. McGee contended that jury's computation of damages was erroneous, as his evidence of damages was unrebutted. Appellees argued that there was no legal basis for the award of anything more than nominal damages on the verdict for the letter sent to the Arizona Medical Board.

The trial court denied Dr. McGee's motion, reasoning either that the jury had discredited Dr. McGee's damages expert, or that the verdict was the result of a jury compromise. However, the trial court granted Appellees' post-trial motion, concluding that it should have instructed the jury that the evidence at trial did not support an award of more than nominal damages if it found that they had breached the settlement agreement by sending the letter to the Arizona Medical Board. The trial court therefore molded the verdict to reduce the awards on the Arizona Medical Board claim to $1 each. The trial subsequently reduced the molded verdict to judgment, and this timely appeal followed.

Dr. McGee first argues that the trial court erred in not granting him a new trial on damages. He contends that the jury's verdict is unsupported by the evidence at trial, as Appellees did not present any expert evidence to

rebut the calculations made by his economics expert, Andrew Verzilli. Verzilli testified that Dr. McGee suffered between $288,638 and $513,222 of lost and future earnings due to his failure to be credentialed at CRMC.

"Our standard of review from an order denying a motion for a new trial is whether the trial court committed an error of law, which controlled the outcome of the case, or committed an abuse of discretion." *Mirabel v. Morales*, 57 A.3d 144, 150 (Pa. Super. 2012) (citation omitted). "A trial court commits an abuse of discretion when it rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id*. (citation omitted).

Unless an error of law controls the outcome of a case, we will not reverse an order denying a new trial. *See Lockley v. CSX Transportation*, 5 A.3d 383, 388 (Pa. Super. 2010). "[A] litigant is entitled only to a fair trial and not a perfect trial." *Id*. at 392 (citation omitted).

Dr. McGee asserts that, pursuant to precedent such as *Kiser v. Schulte*, 648 A.2d 1 (Pa. 1994), *Neison v. Hines*, 653 A.2d 634 (Pa. 1995), and *Carroll v. Avallone*, 939 A.2d 872 (Pa. 2007), the jury's award of less than $288,638 shocks the conscience as it bears no relation to the uncontroverted facts at trial. Appellees note that these three cases are tort cases, and therefore are not directly controlling in this appeal, as the basis for liability was breach of contract. We agree with Appellees that these cases

are not controlling, but conclude that the reasoning applied in these cases is persuasive, and we can find no reason not to apply it in this case.

The general rule in Pennsylvania is that the jury has the freedom to reject all, part, or none of the testimony of any witness. *See Neison*, 653 A.2d at 637. "The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." *Tonik v. Apex Garages, Inc.*, 275 A.2d 296, 299 (Pa. 1971) (citation omitted). However, the jury's verdict "must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by *uncontroverted evidence* presented at trial." *Neison*, at 637 (citation omitted, emphasis supplied). As a result, when a defense expert concedes that the defendant's negligence caused some injury to the plaintiff, a jury verdict may not find that the plaintiff failed to establish causation for "at least some of the plaintiff's injuries." *Andrews v. Jackson*, 800 A.2d 959, 962 (Pa. Super. 2002) (citation omitted).

Here, as in *Carroll*, the issue boils down to "the meaning of 'uncontroverted,' … and whether a defendant's failure to present independent evidence on damages comprises *de jure* acquiescence to a plaintiff's expert's testimony." *Carroll*, 939 A.2d at 874. The *Carroll* Court reviewed *Kiser*:

> In *Kiser*, the expert testified the net economic loss resulting
> from the teenage decedent's death was between $232,400 and

$756,081.43. As here, the defense did not present its own expert, but extensively cross-examined the plaintiff's expert. The $232,400 figure was conceded only after defense counsel suggested the 40% "personal maintenance" deduction was appropriate. The expert testified he would reduce the net economic loss to 232,400 on the bottom end of the range. This Court stated, "Thus, the uncontroverted testimony at trial was that the net economic loss that would result from [the teenage decedent's] death ranged from $232,400.00 to $756,081.43." That is, what was uncontroverted was the minimum estimate of $232,400, which was conceded after cross-examination. The original range was not uncontroverted simply because the defense presented no evidence – the cross-examination challenged that evidence. Therefore, the jury award of about 11% of the uncontroverted range was inadequate.

*Id*., at 874-875 (citations omitted).

In contrast, the **Carroll** Court found that in the case before it, the defense had challenged the plaintiff's expert's presumptions during cross-examination. **See id**., at 875. In particular, the defense had questioned the expert's presumptions that the decedent would have sought employment as a nurse when the expert calculated future lost earnings. **See id**. "The evidence at trial, therefore, does not allow the conclusion [that] that expert's opinion was 'uncontroverted.'" **Id**.

We hesitate to describe the cross-examination of Verzilli in this case as "extensive," but we do agree with Appellees that Verzilli's testimony was challenged in a manner similar to **Carroll**. The following passage is indicative of the defense's approach to Verzilli's testimony:

Q. So you assume that his [Dr. McGee's] termination from St. Luke's would have no effect on his future earning capacity; is that correct?

- 8 -

A.   Yeah. I didn't really – I mean, I assumed it didn't because I – I looked at that he had this, the Carlisle opportunity, which clearly was a measure of his potential and some opportunity for him to earn income.

Q.   I guess that's what I'm getting at. You looked at this Carlisle opportunity, correct? How did you draw the conclusion that Dr. McGee could reasonably expect to have received that Carlisle opportunity, that job?

A. That's – I think that's why we're here. I'm not here on causation. I'm here as had he gotten this job. I'm making that assumption, this was his potential in this type of job. That's what this type of analysis is. I don't make a judgment as to why that didn't happen.

N.T., Trial, 8/24/15, at 253-254.

Furthermore, it is clear from the record that Appellees challenged Dr. McGee's assertion that the erroneous letters were the cause of his loss of employment. Appellees presented the Pennsylvania Standard Application for Physicians submitted by Dr. McGee to CRMC. Page eight of the application asks the applicant to indicate, among others, if his "Employment by any hospital, institution, or the military" or "Clinical privileges or other rights on any hospital medical staff" have been, or are currently in the process of "being denied, revoked, *not renewed*, suspended, limited, restricted, placed on probation, or placed under other disciplinary action, either voluntarily or involuntarily in this or any other state?" (emphasis supplied). Dr. McGee answered "no" to both questions. **See** N.T., Jury Trial, 8/21/15, at 125.

He testified that he believed that these were honest answers. **See id**. He further believed that the agreed upon form letter was worded in a way

that was consistent with his answer on the standard application. *See id*. However, the form letter provides, in relevant part that "St. Luke's Hospital terminated its employment agreement with Dr. McGee," and "Dr. McGee's medical staff privileges expired automatically with the termination of this contract." Thus, the jury had a reasonable basis to infer that Dr. McGee was being far less than completely honest on the standard application he submitted to CRMC. Thus, Appellees were able to present evidence that the erroneous letters were not the *only* cause of CRMC's decision to deny Dr. McGee employment.

Under these circumstances, we conclude that the jury was entitled to disbelieve some or all of the testimony of Verzilli based upon the challenges to his assumptions. Nor do we conclude that Dr. McGee has established that the jury's verdict was based upon evidence of attorney's fees paid by Dr. McGee during his quest to get St. Luke's to produce the letter it sent to CRMC, rather the appropriate basis of its finding of lost past and future wages. Such a conclusion based upon the record before us would be no more than speculation, and would not demonstrate the appropriate deference to the fact-finding responsibilities of the jury. We therefore conclude that Dr. McGee's first issue on appeal merits no relief.

In his second issue, Dr. McGee contends that the trial court erred in reducing the jury's verdict based upon the erroneous letter sent to the Arizona Medical Board. "The duty of assessing damages is within the

province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." ***Betz v. Erie Insurance Exchange***, 957 A.2d 1244, 1264 (Pa. Super. 2008) (citation omitted). "The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake or corruption." ***Haines v. Raven Arms***, 640 A.2d 367, 369 (Pa. 1994).

As noted above, the trial court determined that there was no evidence supporting actual damages on that count, and therefore reduced the verdict to $1 each against St. Luke's and Dr. Bruno. Dr. McGee concedes that "the evidence does not support an award greater than nominal damages for the [Arizona Medical Board] breach[.]" Appellant's Brief, at 44. However, he argues that the verdict represented a compromise verdict reached by the jury and should not be disturbed. ***See*** Appellant's Brief, at 45 ("Assuming, *arguendo*, that the CRMC breach was the product of compromise, the identical award for the [Arizona Medical Board] breach is part of the same compromise.")

We again refuse to speculate on the nature of the verdict reached by the jury. The verdicts based upon the erroneous letter sent to CRMC are supported by sufficient evidence, and therefore we have no reason to

categorize those verdicts as compromise verdicts. We thus have no reason to assume that the Arizona Medical Board breach verdicts were part of a jury compromise. The trial court appropriately molded the verdict to reflect what all parties agree the record reflected. Dr. McGee's second and final issue merits no relief.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/7/2017